**LUMMUS GLOBAL AMAZONAS, S.A., Plaintiff,**

v.

**AGUAYTIA ENERGY DEL PERU, S.R. LTDA., Defendant.**

**No. CIV.A.H–01–495.**

United States District Court, S.D. Texas, Houston Division.

March 27, 2002.

Order Modifying Decision on Denial of Reconsideration June 14, 2002.

---

Charles ThomaS Kruse, Bracewell & Patterson LLP, Houston, TX, for plaintiff.

Adam P. Schiffer, Vinson & Ellkins, Houston, TX, for defendant.

## MEMORANDUM AND ORDER

ROSENTHAL, District Judge.

Lummus Global Amazonas, S.A. ("LGA") designed and built natural gas pipeline, gathering, and processing facilities in Peru for the project owner, Aguaytia Energy Del Peru S.R. Ltda. ("Aguaytia"). The contract between LGA and Aguaytia contained a broad arbitration provision, providing for "final and binding arbitration" under the Rules of Arbitration of the International Chamber of Commerce. In September 1998, the parties began arbitration proceedings to resolve a number of claims and counterclaims under the contract. The proceedings, conducted in two phases, ended in June 2001. The arbitration panel issued three detailed written decisions and an addendum, resolving LGA's claims for unpaid bonuses, change orders, and contract price adjustments, and Aguaytia's counterclaims for liquidated damages for delays, the cost of remedying alleged defects in the construction, payment for pipe paid for but not purchased or installed, and a number of other disputed items. The panel concluded that LGA was required to pay Aguaytia a net amount of $13.4 million, exclusive of interest.

In this lawsuit, LGA moves to vacate, modify, or amend the final and interim arbitration awards, asserting a number of defects in the arbitration process and result. Aguaytia asks this court to confirm and enforce the award, but to enter judgment that reduces the award by an offset of approximately $5.2 million that the parties have stipulated is owed to LGA.

The parties have presented starkly different characterizations of the claims and of the arbitration itself. LGA asserts that it delivered "a working, viable and commercially profitable facility" by the agreed-upon date, that has exceeded the parties' projections of profit. Aguaytia contends that "LGA failed to complete, test and deliver the facilities at the times specified in the Agreement" and delivered the facilities months late, with material defects. LGA asserts that the arbitration represents a "mockery of justice," in which the three-member panel, dominated by one arbitrator LGA challenges as biased, acted in "manifest disregard" of the governing law. Aguaytia asserts that the panel of recognized experts in construction law assembled and painstakingly analyzed a thorough and exhaustive record involving a number of very technical issues; correctly stated and applied the law; and based the specific findings that LGA challenges on the detailed technical facts disclosed in the record and the parties' contract provisions. Aguaytia denies any arbitrator bias and emphasizes that LGA did not raise this claim until after the panel issued its award in favor of Aguaytia.

This court applies the standard for reviewing arbitration awards under the Federal Arbitration Act, 9 U.S.C. §§ 10, 11, and 12, to the extensive record, the arbitration panel's detailed findings, and the parties' contentions. LGA also invokes the Inter–American Convention on International Commercial Arbitration (the "Inter–American Convention"), 9 U.S.C. § 301 *et seq.*, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), 9 U.S.C. §§ 201 *et seq.*

Most of the arguments LGA makes for vacating or modifying the awards challenge specific aspects of the awards. Two arguments, arbitrator bias and the panel's refusal to grant the parties' joint request to incorporate the stipulation as to credits and payments owing to LGA, are alleged as a basis for vacating the entire award. Each of the grounds LGA asserts, with Aguaytia's response, raises the same set of issues: does LGA assert a sufficient basis to permit this court, under the narrow and deferential standard of review mandated by statute, to vacate the results of the already prolonged process that the parties agreed would be final and binding upon them?

Based on the pleadings, the motions and responses, the evidence, the arguments of counsel, and the applicable law, this court concludes that LGA has met the burden that the law imposes to vacate the results of contractually binding arbitration only as to two discrete aspects of the award. One is the award for certain IGV, or Peruvian value-added, taxes. This court vacates the portion of the award addressing LGA's liability for certain IGV taxes and remands that issue to arbitration for a determination as to the amount of taxes owed. The second aspect is the status of the joint stipulation of certain payments and credits owed to LGA. The narrow scope of review does not permit this court to include the stipulation in the final judgment. This court remands the narrow issue of the effect of the stipulation as to payments and credits on the arbitration award to be resolved in arbitration. This court confirms all other aspects of the arbitration award. Specifically, this court DENIES LGA's motion for discovery on the issue of evi-

dent partiality or bias; DENIES LGA's motions to vacate the award in its entirety; GRANTS, in part, and DENIES, in part, LGA's motion to vacate specific aspects of the award; DENIES LGA's supplemental petition and motion to vacate the award; GRANTS, in part, and DENIES, in part, Aguaytia's motion to confirm and enforce the arbitration award; DENIES, without prejudice, Aguaytia's motion for final judgment; and DENIES Aguaytia's request for bond. This court also ORDERS the parties to appear for a status conference on April 12, 2002, at 9:00 a.m., to discuss the most efficient method of proceeding.

The reasons for these rulings are set out below.

## I. Background

Aguaytia is organized and has its principal place of business in Peru. (Docket Entry No. 9). LGA is a Peruvian corporation with its principal place of business in Houston, Texas. (Docket Entry No. 1). LGA is a subsidiary of ABB Lummus Global, Inc., a Delaware corporation with its principal place of business in Houston, Texas. (*Id.*).

In February 1995, Aguaytia issued an invitation to bid for the design and construction of natural gas and natural gas liquid gathering, processing, and pipeline facilities in what the parties both describe as a "jungle" area in Peru. LGA submitted its bid in May 1995. Effective May 31, 1996, Aguaytia and LGA entered into an Agreement to design and construct a gas processing facility, a fractionation facility, and pipelines from wellheads to the gas plant and from the gas plant to other facilities. The pipelines connected the fractionation facility and a newly constructed power plant that was not part of the Agreement.

Clause 24.02(a) of the Agreement required the parties to submit "all disputes arising in connection with or relating to this Agreement" to "final and binding arbitration," "pursuant to the rules of Arbitration of the International Chamber of Commerce." (Docket Entry No. 9, Ex. 7). The Agreement provided that "[t]he substantive law applied in such arbitration shall be the law of New York." (*Id.*).

LGA initiated arbitration proceedings in September 1998. Under the ICC Rules, LGA appointed one of the arbitrators, Robert Rubin, a recognized authority in New York construction law. Aguaytia appointed Michael Jaffe as the second arbitrator. Jaffe is a practicing lawyer with a recognized expertise in construction litigation and experience as an arbitrator. The parties agreed to Allen Overcash as the third, presiding, arbitrator. Overcash teaches and practices construction law and also had experience as an arbitrator.

The parties negotiated and reached an agreement, approved by the panel and the ICC, for a two-phase arbitration. Phase 1 addressed "delay issues, associated damages claims, completion bonus claims, certain pipeline credit issues, a discreet number of defective construction issues and certain claims for extra work ('variances') . . . ." (Docket Entry No. 36, Ex. A, p. 2). Phase 2 addressed "warranty issues and claims of defective work." (*Id.*). Although the Agreement specified Miami, Florida as the place for arbitration, the Terms of Reference the parties and the arbitrators signed specified Houston, Texas as the place for arbitration and stated that the award "shall be considered as having been made at the place of the arbitration, namely Houston, Texas." (Docket Entry No. 12, Ex. E(A)).

The panel began by issuing a set of rulings on legal and contractual issues that did not turn on factual disputes and did not require the presentation of evidence. In the Interim Award on Issues Proposed for Summary Disposition (the "Summary

Disposition"), issued on January 21, 2000, the panel held that under New York law, extrinsic evidence of the parties' intent was not admissible to interpret unambiguous contract provisions; interpreted provisions of the Agreement addressing delays by Aguaytia that could provide LGA a right to extend contractual deadlines and preclude liquidated delay damages for the additional time; and ruled that the Agreement did not impose a $500,000 limit to Aguaytia's right to recover money it had paid LGA for pipe that was not used in the project (the "pipe credit"). The panel deferred consideration of other issues for factual development. (Docket Entry No. 45, p. 2; Aguaytia Ex. 6).

The Phase 1 hearing record included over fifty witness statements, three hundred exhibits, extensive briefs, live testimony from fourteen witnesses taken in nine days of hearings, and post-hearing briefs and exhibits. (Docket Entry No. 19, p. 1). On June 14, 2000, the panel circulated a draft written opinion on the Phase 1 issues. The panel denied most of LGA's claims that Aguaytia's own delays made the liquidated damages provisions inapplicable, finding that Aguaytia was entitled to liquidated damages for LGA's delays, in the amount of $6.7 million. The panel denied LGA's claims for $6.1 million in contract price adjustments; denied LGA's claims for $720,000 in proposed change orders; denied LGA's claims for an early completion bonus; granted Aguaytia a pipe and pipe installation credit of $1.5 million; and found that Aguaytia was entitled to recover from LGA amounts necessary to remedy pipeline corrosion caused by carbon dioxide.

On July 10, 2000, LGA filed a motion to vacate the arbitration panel's draft award. The ICC denied LGA's motion, (Aguaytia Ex. 9), and issued the Phase 1 award (the "Interim Award") on August 16, 2000. The Interim Award addressed each of the parties' arguments in a lengthy and detailed opinion. (Docket Entry No. 36, Ex. A). The Interim Award granted Aguaytia $8,394,678.40 and LGA $600,713.00, for a net award to Aguaytia in Phase 1 of $7,793,765.40. The panel also found LGA liable for certain design and construction defects, deferring determination of the damage amounts to Phase 2.

On October 30, 2000, LGA filed this petition to vacate, modify, or amend the Interim Award. (Docket Entry No. 1). As legal grounds for vacating the award, LGA alleged that the arbitration panel "manifestly disregarded" the applicable law; the panel failed to allow LGA to present evidence; and one member of the panel was biased as a result of an undisclosed conflict of interest, which "tainted" the "entire proceedings." (Docket Entry No. 1, p. 2). Aguaytia challenged the timeliness and effectiveness of service and moved to dismiss or transfer venue; this court denied those motions. (Docket Entry No. 9, 16).

Shortly after entering the Interim Award, the panel began the proceedings related to the Phase 2 issues. After receiving legal memoranda, numerous documents, over thirty witness statements, and expert reports, the panel held seven days of evidentiary hearings, which included oral examination of witnesses. The panel met with each party's counsel to review that party's argument as to each Phase 2 claim and received additional submissions. On April 23, 2001, the panel issued its Final Award, (Docket Entry No. 36, Ex. B), which incorporated the Interim Award.

In the Final Award, the panel granted additional awards of $5,786,738.00 to Aguaytia and $383,419.00 to LGA, resulting in a net Phase 2 award to Aguaytia of $5,403,319.00. The panel also awarded Aguaytia $2,691,088.00 in attorney fees and $525,000.00 in costs. The panel held that

Aguaytia was entitled to be reimbursed for IGV taxes that it had paid or would pay in connection with remedying LGA's defective design and work and with employing attorneys and consultants for the arbitration. The panel could not determine the total amount of IGV taxes that Aguaytia would be entitled to seek from LGA. In the award, the panel established a procedure for Aguaytia to claim reimbursement from LGA if, and when, it paid those taxes. The panel held that Aguaytia was entitled to receive preaward and postaward interest and determined the dates from which interest would accrue.

On June 1, 2001, the parties submitted a Joint Application for Correction of Final Award to the panel under Article 29(2) of the ICC Rules of Arbitration. In the Joint Application, the parties asked the panel to amend the Final Award by incorporating a stipulation that Aguaytia owed LGA $5.2 million in credits. The parties signed the stipulation in May 2001 and notified the panel before the panel entered the Final Award. On June 4, 2001, Aguaytia also filed a separate application for Correction and Interpretation of the Final Award under Article 29(2).

On September 4, 2001, the panel issued an Addendum to the Final Award (the "Addendum"). (Aguaytia Ex. 60). In the Addendum, the panel denied the parties' Joint Application to incorporate the stipulation and reduce the Final Award, stating that "[a]s matters contained in the May 2001 Stipulation were resolved by the parties and are not subject to resolution by the Tribunal, there is no proper basis for 'correcting' or 'interpreting' the Final Award." (*Id.*). The panel granted, in part, and denied, in part, Aguaytia's separate request for interpretation and correction.

LGA filed a First Amended Petition and Motion to Vacate, Modify or Amend Arbitration Awards in this court.[1] (Docket Entry No. 36). LGA challenges the following specific aspects of the award:

(1) The award of liquidated damages to Aguaytia for LGA's failure to achieve interim deadlines under the Agreement.

(2) The "pipe credit" awarded to Aguaytia for unused labor and materials for pipeline that LGA did not purchase or install on the project.

(3) The award of damages to Aguaytia for remedying pipeline corrosion from carbon dioxide.

(4) The award to Aguaytia for a defect in the "as built" drawings.[2]

(5) The establishment of a procedure for Aguaytia to claim reimbursement for IGV taxes.

(6) The award of attorney fees and costs to Aguaytia.

LGA does not specifically challenge the many other rulings and findings that the panel made. LGA does not specifically challenge the Interim Award rulings granting and denying LGA's claims for unpaid bonuses and contract adjustments. The Final Award not only incorporated the Interim Award, but specifically addressed twenty-nine separate items, of which LGA challenges only six. LGA challenges the other points only to the extent LGA asserts that arbitrator bias requires the entire award to be vacated and resubmitted to a new panel.

---

1. LGA challenges the Interim Award, the Final Award, and the Addendum to the Final Award. Because the panel incorporated each of these into the Final Award, this court refers to all three as a single award ("the award") when referring to them jointly.

2. LGA did not include this item in its final summary of the bases for challenging the award, (Docket Entry No. 51).

LGA's specific challenges are based on the following grounds:

(1) Certain aspects of the award are arbitrary and capricious.

(2) In awarding certain damages to Aguaytia, the panel abused and exceeded its authority in the Agreement, issues submitted, and Terms of Reference.

(3) Aspects of the award failed to draw their essence from the contract.

(4) Certain aspects of the award show manifest disregard for New York law.

(5) The panel failed to hear and consider evidence pertinent and material to certain aspects of the case.

(6) The panel failed to issue a final and definite award.

LGA challenges the entire award on the ground that one of the panel members, Jaffe, was partial and engaged in misconduct. (Docket Entry No. 48, pp. 5–6; Docket Entry No. 36). After the panel issued the Addendum, LGA filed a Supplemental Petition and Motion to Vacate Arbitration Awards, asserting that the panel's refusal to incorporate the parties' stipulation as to credits and payments owed LGA, reducing the amount of the award, was, in itself, a sufficient ground for vacating the entire award. (Docket Entry No. 48). LGA asserted that in refusing to incorporate the stipulation, the panel "deliberately engaged in acts of misconduct and violated their duties—all to the prejudice of LGA." (*Id.*, p. 2).

Aguaytia has filed a Motion to Confirm and Enforce International Arbitration Awards, for Judgment and for Posting of Bond. (Docket Entry No. 45). Aguaytia asks this court to enter judgment that includes the $5.2 million the parties stipulate is owing to LGA as an offset. Aguaytia asks this court to confirm the $13.4 million award but enter judgment in the amount of $7,821,539.00, exclusive of interest. Aguaytia also asks this court to order

LGA to post a bond for $9,100,000.00, representing the principal and interest due. Aguaytia asserts that this court has authority to require a bond under Article 6 of the Inter–American Convention and Article VI of the New York Convention.

LGA opposes the motion to confirm and the bond request. LGA argues that this court lacks authority to modify the Final Award by reducing it to reflect the parties' Stipulation. (Docket Entry No. 49). LGA also argues that this court lacks authority to order a bond and, in the alternative, that a bond is unnecessary. (Docket Entry No. 50).

The parties have submitted a voluminous record, including the evidence submitted .to the arbitration panel, motions and correspondence filed with the ICC, the panel's awards, and excerpts of the transcripts from the arbitration proceedings. This court has carefully read each of the parties' briefs and responses, as well as the evidence submitted, and has analyzed the parties' arguments in light of the relevant law. This court addresses each of the issues presented below.

## II. The Applicable Legal Standard

A court considering an arbitration award under the FAA applies a deferential standard of review. *Gulf Coast Indus. Workers Union v. Exxon Co.*, 991 F.2d 244, 248 (5th Cir.1993); *Psarianos v. Standard Marine, Ltd.*, 790 F.Supp. 134, 135 (E.D.Tex.1992), *aff'd*, 12 F.3d 461 (5th Cir.), *cert. denied*, 511 U.S. 1142, 114 S.Ct. 2164, 128 L.Ed.2d 887 (1994). The party moving to vacate an arbitration award has the burden of proof. *Spector v. Torenberg*, 852 F.Supp. 201, 206 (S.D.N.Y.1994). Judicial review of arbitrators' decisions is "extraordinarily narrow" under the Federal Arbitration Act. *In the Matter of the Arbitration Between Trans Chem. Ltd. & China Nat'l Mach. Import & Exp. Corp.*,

978 F.Supp. 266, 303 (S.D.Tex.1997)(citing *Gulf Coast Indus. Workers Union v. Exxon Co.,* 70 F.3d 847, 850 (5th Cir.1995), and *Forsythe Int'l. S.A. v. Gibbs Oil Co. of Texas,* 915 F.2d 1017, 1020 (5th Cir.1990)); *see also Executone Info. Sys., Inc. v. Davis* 26 F.3d 1314, 1320 (5th Cir.1994).

The Federal Arbitration Act provides four grounds for vacating an award:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

■ The Fifth Circuit has held that an arbitration award may be vacated if (1) the award is contrary to public policy; (2) the award is arbitrary and capricious; (3) the award fails to draw its essence from the underlying contract; or (4) the award displays manifest disregard of the law. *Williams v. Cigna Fin. Advisors Inc.,* 197 F.3d 752, 758–61 (5th Cir.1999). Review on these grounds is necessarily narrow, limited to determining whether the arbitration proceeding was fundamentally unfair. *Id.* Courts repeatedly admonish that "severely limited" judicial review is an essential, and inherent, feature of contractually agreed binding arbitration, necessary to avoid undermining the "twin goals of arbitration ... settling disputes efficiently and avoiding long and expensive litiga-

tion." *In the Matter of the Arbitration Between Trans Chemical Limited and China Nat'l Machinery Import and Export Corp.,* 978 F.Supp. 266, 303 (S.D.Tex. 1997), *aff'd,* 161 F.3d 314 (5th Cir.1998).

■ A district court should "interpret the arbitrator's award and the contract broadly so as to uphold the award." *Manville Forest Prods. Corp. v. United Paperworkers Intern. Union AFL–CIO,* 831 F.2d 72, 74 (5th Cir.1987)(citing *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 598, 80 S.Ct. 1358, 4 L.Ed.2d 1424). A district court must accept the arbitrator's factual findings and the arbitrator's interpretation of the contract even if it disagrees with the arbitrator's interpretation of the underlying contract, as long as the arbitrator's decision "draws its essence" from the contract. *Executone,* 26 F.3d at 1320 (citing *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). A district court "must affirm the arbitrator's decision if it is rationally inferable from the letter or the purpose of the underlying agreement." *Id.* (citing *Anderman/Smith Operating Co. v. Tennessee Gas Pipeline Co.,* 918 F.2d 1215, 1218 (5th Cir.1990)).

■■ An award is "arbitrary and capricious" only if "a ground for the arbitrator's decision cannot be inferred from the facts of the case." *Ainsworth v. Skurnick,* 960 F.2d 939, 941 (11th Cir.1992)(vacating award where, despite district court's instruction that Florida law required award of statutory damages, arbitration panel failed to award such damages without explanation). In *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), the Supreme Court stated that a court may set aside an arbitration award "only in very unusual circumstances," and that "parties [are] bound by [an] arbitrator's decision not in

'manifest disregard' of the law." *Id.* at 942, 115 S.Ct. 1920 (citing *Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 98 L.Ed. 168 (1953), *overruled on other grounds, Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). The Fifth Circuit has described *First Options* as the Supreme Court's "clear approval of the 'manifest disregard' of the law standard in the review of arbitration awards under the FAA." *Williams v. Cigna Fin. Advisors Inc.,* 197 F.3d 752, 759 (5th Cir.1999)(citing, *accord, Montes v. Shearson Lehman Bros., Inc.,* 128 F.3d 1456, 1459 (11th Cir.1997); *Barnes v. Logan,* 122 F.3d 820 (9th Cir.1997), *cert denied,* 523 U.S. 1059, 118 S.Ct. 1385, 140 L.Ed.2d 645 (1998); *Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1486 (D.C.Cir. 1997); *M & C Corp. v. Erwin Behr GmbH & Co., KG,* 87 F.3d 844 (6th Cir.1996)).

 A party asserting "manifest disregard" of the law must meet a heavy standard. The Fifth Circuit applies a two-step test:

> First, where on the basis of the information available to the court it is not manifest that the arbitrators acted contrary to the applicable law, the award should be upheld. Second, where on the basis of the information available to the court it is manifest that the arbitrators acted contrary to the applicable law, the award should be upheld unless it would result in significant injustice, taking into account all the circumstances of the case, including power of arbitrators to judge norms appropriate to the relations between the parties.

*Williams,* 197 F.3d at 762 (quoting IAN R. MACNEIL ET AL., 4 FEDERAL ARBITRATION LAW § 20.7.2.6, 40:95 (Supp.1999)(footnote

omitted)). The Second Circuit has described the reach of the "manifest disregard" doctrine as "severely limited." [3] *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202 (2d Cir.1998)(quoting *Government of India v. Cargill, Inc.,* 867 F.2d 130, 133 (2d Cir.1989)). That court stated, "[i]ndeed, we have cautioned that manifest disregard 'clearly means more than error or misunderstanding with respect to the law.'" *Id.* (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986)). To modify or vacate an award on this ground, "a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Id.* (citing *DiRussa v. Dean Witter Reynolds, Inc.,* 121 F.3d 818, 821 (2d Cir.1997)).

 In deciding whether an arbitration panel exceeded its authority, the district court resolves all doubts in favor of arbitration. *Executone,* 26 F.3d at 1320–21 (citing *Valentine Sugars, Inc. v. Donau Corp.,* 981 F.2d 210, 213 (5th Cir.1993)). In reviewing an award, a court is not limited to the panel's explanation of the award. *Id.* at 1325. A district court "looks only to the result reached. The single question is whether the award, however arrived at, is rationally inferable from the contract." *Id.* (quoting *Anderman/Smith Operating Co.,* 918 F.2d at 1219 n. 3).

This standard of review must be applied to each argument LGA makes to vacate or modify the award.

---

**3.** The parties cited primarily to Second Circuit cases in their briefs. Because the parties have addressed the Second Circuit standards for vacatur and because this court finds that the same result would follow under either the Second or Fifth Circuit standard, this court also addresses both.

## III. The Award of Liquidated Damages for LGA's Failure to Meet Interim Deadlines

The arbitration panel awarded Aguaytia $6.8 million in liquidated damages for LGA's failure to meet "interim milestones" set in the Agreement. These "interim milestones" are dates by which LGA had to achieve particular "intermediate construction progress." (Docket Entry No. 36, p. 21). The Agreement defined criteria for three "milestones": (1) "First Completion" (Section 1.01 at p. 5); (2) "Second Completion" (Section 1.01 at p. 12); and (3) "Commercial Operation" (Section 1.01 at p. 2). The panel awarded Aguaytia liquidated damages for LGA's failure to meet requirements for the First and Second Completions. (Docket Entry No. 36, Ex. A, p. 3).

The Agreement provided that if LGA failed to achieve First Completion by the Guaranteed First Completion Date of December 30, 1997, LGA would pay liquidated damages of $43,000 per day until it achieved First Completion. If LGA failed to achieve Second Completion by the Guaranteed Second Completion Date of January 30, 1998, LGA would pay liquidated damages of $20,000 for each day of delay, subject to a maximum. The Agreement also provided that LGA would be paid a bonus for each day it saved on these contractual deadlines.

LGA does not dispute that delays occurred. Instead, LGA argues that under the New York law governing "concurrent delay," Aguaytia's own delays entitled LGA to an extension of time and abrogated Aguaytia's right to obtain contractual liquidated damages. In arbitration, LGA asserted that it was entitled to an extension of the contractual deadlines; delay damages; and an early completion bonus. Aguaytia contended that none of the acts or omissions LGA asserted met the contractual requirements for a delay that

could extend the contract deadlines and preclude liquidated damages for that period. The arbitration panel considered each of Aguaytia's acts and omissions that LGA claimed caused its own delay in achieving the First and Second Completions. The panel found that as to one area, LGA was entitled to an extension of time for Aguaytia's concurrent delay. As to the remaining areas, the panel concluded that LGA had not proven the elements necessary to show a "Company Delay" as defined by section 13.01(a) of the Agreement. LGA asserts that the panel acted in "manifest disregard" of New York law governing "concurrent delay" and indefinite contract terms, which resulted in an "arbitrary and capricious" liquidated damages award. (Docket Entry No. 36, p. 10).

### A. Concurrent Delay

During Phase 1 of the arbitration, both LGA and Aguaytia presented witness statements, cross-examined witnesses, presented experts, and argued about whether Aguaytia's own acts and omissions contributed to LGA's failure to meet the interim construction deadlines, so as to relieve LGA of the liquidated damages provided under the Agreement. LGA asserted that Aguaytia's "Company Delays" caused LGA to be delayed in achieving both the First and Second Completions.

Section 13.01(a) of the Agreement defines a "Company Delay," as follows:

> If (i) Contractor is delayed in performing any aspect of the Work due to a delay of Company in performing its obligations under this Agreement, (ii) the cause of such delay does not arise from Force Majeure, and (iii) Contractor is unable to proceed with other portions of the Work so as not to cause a delay in the First Completion Date, the Second Completion Date, and/or the Commercial Operation Date, the Contractor shall

give Company notice of the occurrence of such condition as soon as it becomes aware thereof (a *"Company Delay"*).

Section 16.02 of the Agreement provided that the contract deadlines could be adjusted as:

a result of Company Delay ... that will cause a delay in the Project Schedule such that there will be a corresponding delay in Contractor achieving the First Completion Date, the Second Completion Date, ... in which event Contractor shall be entitled to a one day extension ... for each such day of delay ....

In the Interim Award, the panel explained why it concluded that there was one "Company Delay" on the part of Aguaytia that, under the doctrine of concurrent delay, extended the First Completion Date by almost one month, in LGA's favor. The panel also explained why it concluded that the other acts and omissions LGA asserted were not "Company Delays" by Aguaytia and did not warrant extensions of the completion dates or preclude liquidated damages for the days LGA failed to meet the deadlines. (Docket Entry No. 43). LGA asserts that the panel "manifestly disregarded" New York law on concurrent delay in reaching these conclusions. LGA argues that the panel applied a more rigorous "total time" standard, set out in federal Court of Claims cases addressing the burden on a party seeking to recover liquidated damages on government contracts.

The panel recognized in both the Summary Disposition and the Interim Award that New York law on concurrent delay applied. In the Summary Disposition, the panel stated that in order to receive an extension under the parties' Agreement, LGA had to demonstrate: (1) the existence of a "Company Delay" by Aguaytia, as defined in Section 13.01(a) of the Agreement, and (2) that the Company Delay actually impaired LGA's ability to meet the deadlines under Section 16.02(a)(ii) of the Agreement. (Aguaytia Ex. 6, p. 3). The panel stated that "[l]iquidated damages will not be recovered by [Aguaytia] for LGA's delays where, and to the extent, there are concurrent Company Delays that impaired LGA's achieving the relevant contract milestone." (*Id.*, p. 13). LGA does not dispute this statement of the concurrent delay rule.

The panel noted that LGA had conceded that it had to "[e]stablish a causal link between the claimed Company Delay and its inability to progress the work necessary to achieve the particular contract milestone for which it seeks a Target Schedule Adjustment." (Aguaytia Ex. 6, p. 4). The panel cited to New York law and rules. (*Id.*, p. 12)(citing CUSHMAN & MEYERS, CONSTRUCTION LAW HANDBOOK, § 23.01[D], p. 825 (Aspen Law 1999)). LGA agrees that the panel correctly stated the applicable New York law on concurrent delay and that the panel correctly applied the law when it granted LGA a twenty-seven day extension of the First Completion Date based on a shared responsibility for a pressure control valve that was not timely installed. LGA argues that except as to as to this one area, the panel failed to apply New York law on concurrent delay and instead applied a more stringent federal law standard that uses a "total time" analysis.

Under a "total time" analysis, LGA had to prove the following elements: a causal connection between Aguaytia's improper conduct and a specific amount of delay; that other methods (other than the one prohibited by Aguaytia) to achieve the same result were not available; or that such methods, if used, would have been unavailing. (Docket Entry No. 36, Ex. A, p. 8)(citing *WRB Corp. et al. v. United States,* 183 Ct.Cl. 409, 427 (Ct.Cl.1968)).

The panel specifically addressed five areas that LGA asserted as "Company Delays": Aguaytia's denial of right of way access to LGA; Aguaytia's announced plan to shut down two wells; Aguaytia's inspectors' refusal to allow LGA to use tack welds to close pipe ends, resulting in dirty pipes that slowed LGA's pipe cleaning; Aguaytia's failure to control inlet pressure of gas into the plant; and Aguaytia's rejection of LGA's pipeline tests. The record reveals that the arbitration panel considered each of these arguments and found that LGA had failed to show a Company Delay by the project owner, Aguaytia, as defined in Section 13.01(a) of the Agreement. The record supports these findings.

As to the claim of failure to provide access to the right of way, the panel found that Aguaytia had not breached any obligation under the parties' "early start agreement" or under the Agreement itself to make right-of-way access available before a certain date. The panel also concluded that LGA did not show that its inability to have right of way access before that date was a "critical path delay." The panel did not, as LGA contends, apply federal law to this issue. Instead, the panel examined the Agreement provisions on access; heard the disputed evidence as to the effect of obstructed right of way access; and concluded that LGA had not met the contractual criteria for a "Company Delay" that would trigger the application of the concurrent delay rule. (Docket Entry No. 36, Ex. A, pp. 5). Federal case law involving a "total time" analysis played no role in the panel's decision on this issue.

The panel cited federal case law, and referred to a "total time" analysis, as to only two of the "Company Delay" claims. The panel did not cite federal law, or refer to a "total time" analysis, in analyzing the right of way access delay claim; the claim of delay from Aguaytia's planned shutdown of two wells; or the claim of delay

from the failure to control inlet pressure of gas into the plant. The panel did cite federal cases and law, and refer to a "total time" analysis, in its decision on LGA's claim that Aguaytia's refusal to allow tack welded end caps on open sections of pipeline caused dirt and debris to gather in the pipelines and delayed the pipeline cleaning work. The panel also referred to a "total time" analysis in discussing LGA's claim of delay arising from Aguaytia's rejection of certain tests LGA performed. A review of the record reveals that in neither section of the award did the panel manifestly disregard controlling New York law.

In its discussion of the impact of Aguaytia's refusal to allow LGA to tack weld end caps on pipes during construction, the panel first examined whether the refusal amounted to a "Company Delay" under the Agreement. The panel concluded that the evidence showed that LGA had a number of alternatives available to mitigate the effect of Aguaytia's refusal to allow tack welds and that LGA had failed to show that there was a causal connection between Aguaytia's "improper refusal ... and a specific amount of delay later in the cleaning and testing process." The panel found no Company Delay as defined in section 13.01 of the Agreement. The panel went on to note that, in addition to the inability to show a "Company Delay," LGA had not shown the prerequisites to a total time claim, citing federal cases. However, the panel did not deny this delay claim by manifestly disregarding the New York law of concurrent delay. Rather, the panel based its denial on the conclusion that LGA had not made the necessary showing under the contractual definition of "Company Delay."

LGA also challenges the panel's rejection of the claim that Aguaytia had improperly rejected test results as based on a "total time" theory. The panel's dis-

cussion states that "LGA approached the issue as a total time claim"; the panel concluded that LGA had not met the requirements. (Docket Entry No. 36, Ex. A, p. 11). In one of its briefs in support of its petition, LGA stated that "[a]ssuming without conceding that LGA employed a 'total time analysis', New York courts permit the use of the 'total cost method' where it is 'prohibitively difficult or speculative to follow the ordinary measures of damages.'" (Docket Entry No. 25, p. 20). The panel rejected LGA's total time basis for claiming that Aguaytia's test result rejection had delayed LGA's work by fifty-one days. The panel went on to analyze the evidence showing problems with LGA's testing and with its work on the pipeline, which caused problematic test results. The panel concluded, again relying on the contractual definition of "Company Delay" in section 13.01 and the evidence in the record, that LGA had not shown a Company Delay that would trigger application of the concurrent delay rule. The panel did not apply a federal law "total time" standard, in manifest disregard of New York law on concurrent delay.

LGA's citation to New York cases applying the doctrine of concurrent delay do not support its argument that the panel manifestly disregarded New York law. In *Mosler Safe Co. v. Maiden Lane Safe Deposit Co.*, 199 N.Y. 479, 93 N.E. 81 (1910), the court held that if an owner or the architect acts so as to delay a contractor's work, the contractual provision for liquidated damages for delay is waived and cannot be renewed. The court relied on the general rule that damages for delays caused by mutual fault cannot be apportioned unless the contract permits substitution of another date for completion. *Id.* at 83–84. The court explained that while a liquidated damages clause does not have "the harshness of a penalty, it is, nevertheless, in its nature, such that its enforce-

ment, where the party claiming the right to enforce has, in part, been the cause of delay, would be unjust." *Id.* at 83. In *XLO Concrete Corp. v. John T. Brady & Co.*, 104 A.D.2d 181, 482 N.Y.S.2d 476 (N.Y.App.Div.1984), the court described *Mosler Safe* as "clearly addressing a situation where the liquidated damages clause sought by the owner exceeded its actual delay damages and the court was concerned with the injustice of permitting the owner to reap the benefit of the liquidated damage clause." *Id.* at 480. This case does not present such a situation.

In *Halligan*, the court vacated an award based on manifest disregard of the law. The plaintiff had presented "overwhelming" and "strong" evidence of age discrimination, but the arbitrator denied the claim without explanation. 148 F.3d at 203–04. The court acknowledged that arbitrators are not required to explain their awards, but stated that when a court is already inclined to hold that a panel manifestly disregarded the law, the failure to explain may be taken into account to support that result, especially if all imaginable explanations would "strain credulity." *Id.* at 204. In this case, unlike *Halligan*, the arbitration panel painstakingly explained its reasons for its decisions in awarding liquidated damages for the delays. The record in this case presents neither overwhelming evidence against the result reached nor an absence of explanation for that result.

■ An award does not result from "manifest disregard" of the law merely because of error in understanding or applying the law. An award may not be vacated on this basis unless the arbitrators manifestly acted contrary to the applicable law, resulting in significant injustice. *Williams*, 197 F.3d at 762. This court finds that LGA has failed to carry its burden to show that the panel's decisions granting liquidated damages and rejecting

LGA's claims of Company Delays resulted from "manifest disregard" of New York law on concurrent delay, under either the Fifth or Second Circuit standard. For the same reasons, this court finds that LGA failed to allege or present facts showing that the panel's award was arbitrary and capricious.[4]

This court DENIES LGA's motion to vacate, modify, or amend the liquidated damages award on the basis of manifest disregard of the law of concurrent delay.

## B. Indefiniteness of Contract Terms

■ LGA argues that it should not be held liable for liquidated damages for its delay in obtaining the First and Second Completion Deadlines because the contract terms used to measure compliance with the Deadlines were so indefinite as to be unenforceable. LGA argues that the panel manifestly disregarded New York law making vague and indefinite contract terms unenforceable.

Section 1.10 of the Agreement required LGA to perform certain tests "in accordance with Section 4.05" in order to achieve the First Completion and Second Completion Dates.[5] Section 4.05 of the Agreement states that all performance tests must be "conducted and measured as provided in Schedule 4.05," which, in turn, sets out the conditions for the initial performance tests required to achieve the First and Second Completion Dates. The panel imposed liquidated damages for LGA's delay in achieving these dates, due to problems with the initial performance tests. The panel found that although LGA conducted initial performance tests on the gas plant in late December 1997, in March 1998, and in early May 1998, "[p]rior to the tests that were run on May 20–22, 1998, the requirements of the Agreement regarding First Completion were not met." The panel found that before that date, LGA did not do some of the tests and did others improperly. The panel held LGA responsible for liquidated damages for delays to May 22, 1998 for First Completion and May 22, 1998 for Second Completion.

LGA first argues that under the Agreement, it was not obligated to meet "performance guarantees" required for "complete

---

4. LGA also challenges the panel's award of liquidated damages on the basis that Aguaytia failed to keep a Project Schedule, as required by the Agreement. (Docket Entry No. 39, p. 2). However, as Aguaytia noted, the absence of a Project Schedule would have been relevant only if the panel needed to determine the impact of a Company Delay on the Target Schedule. LGA has not challenged the one instance in which the panel found a Company Delay or the extension it received. During Phase 1, LGA's scheduling expert acknowledged that Aguaytia's failure to maintain a Project Schedule would only impact the party's rights if it was the basis for denying an extension or Company Delay. The panel's award of liquidated damages, despite Aguaytia's failure to keep a Project Schedule, is not contrary to the essence of the Agreement. The lack of a Project Schedule was not relevant to the panel's determination of liquidated damages, in the absence of a Company Delay. (Docket Entry No. 19, p. 20).

5. Section 1.01 defines First Completion to include:

(iii) initial performance of the Throughput Test, the Propane Recovery Test, and the Guaranteed Fuel Usage Test *in accordance with Schedule 4.05;* provided, however, that Contractor does not have to satisfy the Performance Guarantees described in Section 2.06 to achieve the Second Completion Date.

Section 1.01 defines Second Completion to include:

(ii) Mechanical Completion of the NGL Fractionation Facilities, ...

(iii) initial performance of the LPG Test, the Natural Gasolines Pressure Test, and the 33.3% Guaranteed Capacity tests as described in Section 2.06 has been completed *in accordance with Schedule 4.05;* provided, however, that Contractor does not have to satisfy the Performance Guarantees described in Section 2.06 to achieve the Second Completion Date.

operation" in order to meet the First and Second Completion requirements. The panel's decision is consistent with LGA's position. In its decision, the panel acknowledged that LGA did not have to meet the performance guarantees contained in Section 2.06 of the Agreement to meet the First and Second Completion requirements. However, according to the panel, LGA did have to meet the protocols set out in Schedule 4.05 of the Agreement. (Docket Entry No. 36, Ex. A, p. 9). The panel concluded that LGA had failed to perform some of the tests necessary to achieve the First and Second Completions and had performed others improperly by failing to comply with the protocols described in Schedule 4.05.

LGA argues that the Section 4.05 protocols it failed to satisfy are too indefinite to be enforceable under New York law. LGA focuses on the provision in Schedule 4.05, requiring the contractor to establish inlet stream rates and conditions "as nearly as possible" to the design conditions and to adjust plant operation conditions to conform "as nearly as possible" to the design conditions. (Docket Entry No. 25, p. 30; Section 4.05(i)). LGA argues that these provisions are analogous to contract clauses "purporting to obligate a party to use its 'best efforts' in achieving an end," which New York courts have found unenforceable for indefiniteness. (*Id.*, p. 31)(citing *Strauss Paper Co., Inc. v. RSA Exec. Search, Inc.*, 260 A.D.2d 570, 688 N.Y.S.2d 641, 642–43 (N.Y.App.Div.1999)).

LGA's argument is not supported by the record before the arbitration panel or the basis of its decision. Even assuming that the phrase "as nearly as possible" is similar to the phrases in the cases cited, the panel's decision did not turn on LGA's failure to conduct tests "as nearly as possible" to the design conditions.[6] The panel found that LGA failed to perform a Propane Recovery Test, which section 1.01 of the Agreement specifically required for First Completion. The panel also found that LGA had failed to run the tests for forty-eight hours, a definite part of the Schedule 4.05 protocols that LGA had to satisfy. The panel found that under the contract, LGA could not attain Second Completion until it completed the tests for the Fractionation Plant, as required in Section 1.01 of the Agreement. Again, the panel did not rest its conclusion on LGA's failure to comply with criteria LGA faults as vague and indefinite.

LGA's final challenge to this aspect of the award is that the panel's findings are contrary to the "essence" of the parties' agreement. LGA argues that the forty-eight hour requirement was part of a performance guarantee set out in Section 2.06 of the Agreement, not a required protocol under Section and Schedule 4.05. LGA points to deposition testimony from an Aguaytia witness, who explained that the business purpose for the First Completion Date in the Agreement was that Aguaytia "needed to have a facility that was capable of running and supplying gas to our power plant." (Docket Entry No. 25, p. 32). LGA argues that it provided usable gas to the plant by the First Completion deadline, meeting the purpose of the contractual requirement.

■ The award must be sustained if the arbitrator's decision "draws its essence" from the Agreement. *Executone*, 26 F.3d at 1320 (quoting *United Paper-*

---

6. LGA asserts that the panel "flatly ignor[ed] LGA's argument at the hearings and in its post-submission briefing, that the testing 'requirements' for 'First Completion' and 'Second Completion' were too indefinite and vague to be enforceable." (Docket Entry No. 36, p. 31). LGA does not explain what sections of the record show that the panel ignored LGA's arguments, as opposed to considering and rejecting them.

*workers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). The Fifth Circuit has stated that an award fails the "essence" test only when it is "so unfounded in reason and fact, so unconnected with the wording and purpose of the [agreement] as to 'manifest an infidelity to the obligation of an arbitrator.'" *Id* at 1325 (quoting *Brotherhood of R.R. Trainmen v. Central Ga. Ry.*, 415 F.2d 403, 412 (5th Cir.1969), quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). LGA is correct that Section 2.06 of the Agreement, pertaining to performance guarantees, states that LGA must run the tests for two consecutive twenty-four hour periods. Section 1.01 states that LGA did not have to satisfy the performance guarantees in the performance tests necessary to achieve the First and Second Completion Dates. However, LGA did have to conduct the tests under Section 4.05 and the Schedule 4.05 protocols. Schedule 4.05 also refers to the "48 hour performance test" and the "48 hours test period." (Agreement, Section 4.05(h) and (j)). Aguaytia notes that LGA's start-up supervisor, Ed Munoz, "conceded at the Phase 1 hearing the necessity that LGA run the performance test for 48 hours." (Docket Entry No. 19, p. 24).[7]

Section 4.05 could reasonably be interpreted to impose a forty-eight hour testing requirement for the tests that were clearly necessary to achieve the First and Second Completion Dates. LGA has not shown that the panel's interpretation was so unreasonable as to be contrary to the "essence" of the parties' agreement.[8]

The panel members interpreted the Agreement and the evidence and unanimously determined that LGA did not meet the requirements for either the First or Second Completion Dates until May 22, 1998. The panel used that date in assessing liquidated damages for delay under the Agreement. LGA has failed to allege or present facts showing that the panel's interpretation of the contract requirements for achieving the First or Second Completion Dates manifestly disregarded New York law, that upholding that interpretation would result in significant injustice, or that the result fails to draw its essence from the contract. *Williams*, 197 F.3d at 762. LGA also has failed to show that the panel's interpretation of the Agreement

7. Munoz testified on direct examination as follows:

> Q: Did you understand that as part of the procedure for the performance test, that the plant would need to operate for 48 hours as one of the criteria.
> A: Yes.
> [Counsel for LGA objected that examiner did not specify which performance test.]
> Q: Any performance test.
> A: Yes.

(Docket Entry No. 19, p. 24)(quoting Ex. 19, transcript, p. 798 line 1 through p. 799 line 7)

8. The panel also rejected LGA's argument that under the Agreement, any extension of the First Completion Date would automatically entitle LGA to an extension of the Second Completion Date because the two dates were in "lock step." The panel examined the provisions of the Agreement, including the Section 1.01 definitions, which measure each of the dates from the Commencement Date. The panel held that "the Guaranteed Second Completion Date is independent of the Guaranteed First Completion Date," finding that while "a delay to some aspect of the work required for First Completion could also delay Second Completion," an extension of the First Date "does not *ipso facto* result in a commensurate extension" of the Second Date. (Docket Entry No. 36, Ex. A, p. 13). LGA's argument that this interpretation fails to draw its essence from the Agreement fails; the interpretation is rationally inferable from the terms of the Agreement. By recognizing that delay in the first milestone could, but was not required to, extend the second milestone, this interpretation is consistent with the Agreement's structure.

was not "rationally inferable from the letter or the purpose of the underlying agreement," so as to be arbitrary and capricious. *Executone*, 26 F.3d at 1320.

This court DENIES LGA's motion to vacate, modify, or amend the liquidated damages award on the basis of indefinite contract terms or the panel's interpretation of the contractual requirements for the First and Second Completion Dates.

## IV. The Award of Carbon Dioxide Corrosion Damages and New York Law on the Basis of Design

■ LGA asserts that the panel acted in manifest disregard of New York law when it awarded almost $1.6 million to Aguaytia for work necessary to remedy carbon dioxide corrosion in the project pipes and plants. (Docket Entry No. 36, p. 25). The corrosion was caused by the combination of free water in the production facility and carbon dioxide in the produced gas.[9] LGA argues that it designed and constructed the pipes on the "Basis of Design" Aguaytia furnished in Schedule 2.06 of the Agreement. LGA relies on the following description of the water content in the pipes: "Sat... LB/MMSCF." LGA argues that this description "effectively caused LGA to design pipelines ... for saturated natural gas with no free water consistent with industry standards." (Docket Entry No. 36, p. 26). LGA argues that the panel manifestly disregarded New York law that entitled LGA to design and construct facilities consistent with Aguaytia's "Basis of Design."

LGA cites *Young Fehlhaber Pile Co. v. State*, 265 A.D. 61, 37 N.Y.S.2d 928

(N.Y.App. Div.—3d Dept.1942) for the general rule that a contract bidder may "properly rely upon the clear and unequivocal information contained in the plans, otherwise they would serve no useful purpose." *Id.* at 929. In *Young Fehlhaber*, the court stated that plans "should reasonably depict the work to be done and where they are definite and plain the contractor is entitled to rely upon them." *Id.* at 930. In *Young Fehlhaber*, the court held that the State could not recover damages for the costs of reconstructing a bridge because the State had provided the contractor with plans showing the river depth to be four feet shallower than the actual depth. The court found that the State knew its plans to be inaccurate and that the State had committed fraud in its representations to the project bidders. *Id.* at 929.

In this case, the panel did not disregard New York law on the basis of design. The panel analyzed the parties' contentions and evidence as to whether Aguaytia's statements in Schedule 2.06 of the Agreement were "sufficient to alert [LGA] to the possibility of corrosion within the pipelines that it was designing." (Docket Entry No. 36, Ex. A, p. 17). The parties agree that "Sat... LB/MMSCF" indicated that the gas would be saturated. (Docket Entry No. 21, Ex. 18, p. 8). During the arbitration, both parties presented evidence as to the meaning of "saturated" in Schedule 2.06 and whether that description necessarily implied the absence of free water in the system.

LGA asserts that it presented "competent, unrebutted expert testimony" to the

---

9. In the system at issue, water vapor (the solute) was dissolved in produced gas (the solvent). When there is more water than can be dissolved in the gas, water vapor condenses into "free water." "Free water" is water that is out of solution and available to combine with other compounds in the system.

(Aguaytia Ex. 18, p. 8). Carbon dioxide and water in a gas stream interact to form weak corresponding acids, carbonic and sulfuric, which are corrosive to carbon steel pipes. (LGA Ex. 10, p. 12). In the absence of water, carbon dioxide generally is non-corrosive. (*Id.* at 5.0A, p. 1).

panel that the specification in the Agreement allowed LGA to assume the absence of free water in the pipe system. LGA presented testimony from its expert, William Krause, that Schedule 2.06's specification of the gas stream at the Gas Plant inlet as "Sat." necessarily meant that there would be no "free water" at the plant fence. However, Aguaytia presented evidence disputing Krause's testimony. Aguaytia's witnesses, including James McHaney and Tony Hines, presented evidence that the term "Sat." did not address or exclude the probability of free water in the gas stream. (Docket Entry No. 21, Ex. 18, p. 8). These witnesses testified that the information available to LGA, including the information as to the composition of the gas stream, was sufficient to inform LGA that there was a likelihood of carbon dioxide corrosion in the pipes; that LGA had conducted a corrosion analysis that was inadequate for the gas plant piping and equipment; and that LGA had not included corrosion allowance or inhibitors for the gather lines, resulting in serious damage from corrosion.

The panel considered the conflicting expert testimony and the exhibits. The panel concluded that the statements and information in Schedule 2.06 of the Agreement, with other information available to LGA, told LGA that both carbon dioxide and water were present in the gas stream and that changes would occur in the temperature of the gas and in the gas pressure in the pipeline from the wellhead to the Gas Plant that would likely result in water condensation. The panel concluded that LGA had information from Aguaytia to disclose that carbon dioxide could be present and could cause corrosion in the pipe-

lines LGA was designing. (Docket Entry No. 36, Ex. A, p. 17). The panel rejected LGA's argument that the statement that the gas would be "Sat." necessarily meant that there would be no free water in the pipes.[10] That decision is supported by evidence in the record.

The record supports the panel's finding that applying New York law on the basis of design to the Agreement specification at issue did not permit LGA to assume the absence of free water in the system. The panel concluded that the information Aguaytia provided was sufficient to notify LGA of the possibility of corrosion if it did not take steps to address the presence of carbon dioxide and water in the system. (Docket Entry No. 36, Ex. A, p. 17).

During Phase 2, LGA argued that the measure of corrosion damages should be limited to $432,000.00, the cost of repairing the corrosion in the pipes according to LGA's proposed method. The panel again heard expert testimony from both sides and determined that Aguaytia's proposed method for addressing the corrosion damage, while more costly, "can be considered prudent for the safe operation of the plant" and was "appropriate, prudent, and reasonable from a cost perspective." (Docket Entry No. 36, Ex. B, p. 33, p. 34). In the Final Award, the panel reiterated that it had determined that, contrary to LGA's argument, "Schedule 2.06 did not relieve LGA of responsibility for addressing the presence of $CO_2$ in the gas." (*Id.*, p. 34 n. 7).

The panel explained its conclusion as based on its interpretation of the Agreement, the expert testimony, and the other

---

**10.** Aguaytia's expert witness, James McHaney, stated in his report that:

The term "saturated" applies only to the amount of solute (water vapor in this case) that has been dissolved in the solvent (produced gas in this case). Use of the term "saturated" includes no implications about the presence or absence of excess solute (free water in this case).

(Aguaytia Ex. 18, p. 8)(parentheses in original)

evidence submitted. This court finds that the panel's conclusions did not manifestly disregard New York law on the basis of design. Instead, the panel based its conclusion on an analysis of the record evidence as to the design information Aguaytia provided to LGA to use in designing and constructing the plant and pipelines. This court DENIES LGA's request to vacate, modify, or amend the portion of the award relating to damages for carbon dioxide corrosion.

## V. The Panel's Evidentiary Ruling: The Award for Pipe Credit

■ LGA asserts that the panel wrongfully excluded evidence of what the parties intended Section 5.05(b) of the Agreement to mean, "in violation of the Inter–American Convention, Article 5(1)(b), the New York Convention, the FAA, 9 U.S.C. § 10(a)(3), and in violation of LGA's due process rights." (Docket Entry No. 36, p. 32). LGA argues that the panel's exclusion of this evidence resulted in a wrongful award of $1,014,000.00. (*Id.*). Aguaytia responds that the panel properly excluded the evidence and that its ruling cannot form a basis for vacating or modifying the award. (Docket Entry No. 19, pp. 25–29).

> Section 5.05(b) of the Agreement states: The maximum amount of adjustment to the Contract Price that shall occur as a result of differences in pipe length is an upward or downward adjustment of U.S. $500,000, regardless of the actual required length of pipe installed.

In the arbitration, and in this court, LGA asserted that Section 5.05(b) imposed a $500,000.00 limit on the amount that Aguaytia could receive as credit for the cost of pipe and for pipe installation services that LGA had never purchased or performed. In the Summary Disposition, the panel concluded that the $500,000 cap applied only to credit for amounts Aguaytia had paid for installing pipe that was not used. The panel concluded that the $500,000 cap did not apply to limit the credit Aguaytia could receive for amounts it had paid LGA for pipe material that LGA had not purchased. The panel stated as follows:

> LGA's argument is plausible only if read in isolation. Rather, Section 5.05(b) and Schedule 5.05(b) [11], which is specifically referenced in Section 5.05(b) make it plain that the cost of the pipe material itself and the cost of the installation are treated separately. Section 5.05(b) focuses on the cost of installation, leaving the matter of material cost adjustment to the text at the top of Schedule 5.05(B), namely: if the extra pipe was ordered, it is to be delivered to [Aguaytia] and LGA is to be paid for the pipe; if the pipe length is adjusted before the pipe was ordered, the price for the pipe material will be "the actual invoice and amount of the pipe, coating and freight." LGA's isolated reading of the last sentence of Section 5.5(b) [sic] is not only askew from New York law, which requires that the provisions of an agreement are to be read in the context of the entire agreement,[12] but makes no practical sense. Imagine, for example, LGA being required to absorb the material cost associated with a huge increase in the length of the pipeline. That result would be as inequitable as a result that

---

11. Schedule 5.05(B) is referred to as Schedule 5.05(b) in the Agreement. (Aguaytia Ex. 6, pp. 13–14)(footnote in original)

12. *S & S Media Inc. v. Vango Media, Inc.*, 84 A.D.2d 356, 446 N.Y.S.2d 52, 54 (N.Y.App. Div.1982); *In the Matter of the Estate of Wilhelmina Friedman*, 64 A.D.2d 70, 407 N.Y.S.2d 999, 1005 (N.Y.App.Div.1978). (Aguaytia Ex. 6, pp. 13–14)(footnote modified from original format).

pays LGA for pipe that it never ordered or for which it never paid. Yet, that is precisely the result that would obtain if we were to read the last sentence of Section 5.05(b) as LGA now urges.

Based on the entirety of Section 5.05(b) and Schedule 5.05(B), the Arbitral Tribunal declares:

The $500,000 limitation in Section 5.05(b) of the Agreement does not preclude [Aguaytia's] claim for a price adjustment for the pipe material as a result of a reduction in the quantity of pipe required for the Project.

(Docket Entry No. 21, Aguaytia Ex. 6, pp. 13–14).

LGA submitted affidavits from one of its employees who had negotiated the Agreement with Aguaytia. In the affidavits, the witness stated that during negotiations, the parties discussed the $500,000 cap as applying to the cost of both procuring pipe material and installing the pipe. The panel struck these portions of the affidavits in procedural rulings issued in February 2000. The panel excluded the evidence under rulings applying New York law included in the Summary Disposition: "before a tribunal may receive extrinsic evidence as an aid to the interpretation of an agreement, the tribunal must conclude that the provision at issue is ambiguous. And, under New York law, a provision is ambiguous if it is susceptible to at least two reasonable, competing constructions." (Docket Entry No. 21, Ex. 6, p. 3). At the hearing, the panel followed this approach and precluded LGA from cross-examining one of Aguaytia's witnesses on the $500,000 cap.

LGA requested the panel to reconsider its ruling on the meaning of Section 5.05(b). In the Interim Award, the panel denied the motion for reconsideration, stating that "[w]hile the textual argument made by LGA is consistent with a literal reading of the particular sentence in Section 5.05(b), the result is at odds with the structure and intent of the Agreement read in its entirety, as New York law requires." (Docket Entry No. 36, Ex. A, p. 18). LGA argues that the panel's two rulings are inconsistent: by stating that LGA's interpretation was consistent with a "literal reading" of Section 5.05(b), the panel acknowledged that Section 5.05(b) could be given two different interpretations, making it ambiguous and making external evidence of the drafters' intent admissible. LGA alleges that the panel's evidentiary rulings excluding the affidavits and the cross-examination are a refusal to hear evidence "pertinent and material to the controversy," a statutory ground for vacating the arbitration award.

 The Federal Arbitration Act permits a court to vacate an award if "the arbitrators were guilty of misconduct in ... refusing to hear evidence pertinent and material to the controversy[,] or of any other misbehavior by which the rights of the party have been prejudiced." 9 U.S.C. § 10(a)(3). The New York Convention provides that an award is unenforceable if "[t]he party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or the arbitration proceedings or was otherwise unable to present his case." New York Convention, Art. V(1)(b). The provision as to the inability to present the case applies to an arbitrator's evidentiary rulings. *See Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir.1992).

 The arbitrator is the judge of the relevance and admissibility of the evidence presented in an arbitration proceeding. *Cordis Corp. v. C.R. Bard, Inc.*, 1993 WL 723844, * 3 (S.D.Tex. Mar.11, 1993)(citing *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir.1985)); *see also Fairchild & Co., Inc.*

*v. Richmond, Fredericksburg & Potomac R.R. Co.*, 516 F.Supp. 1305, 1314 (D.D.C. 1981)("[I]t should be remembered that arbitrators are charged with the duty of determining what evidence is relevant and what is irrelevant.")(citing *Petroleum Transport, Ltd. v. Yacimientos Petroliferos Fiscales*, 419 F.Supp. 1233, 1235 (S.D.N.Y.1976), *aff'd*, 556 F.2d 558 (2d Cir. 1977)). An arbitration award will be set aside only if the exclusion of the contested evidence prevented the parties from receiving a fundamentally fair hearing. *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir.1995); *see also Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16 (2d Cir.1997)("Our review is restricted to determining whether the procedure was fundamentally fair.") (citation omitted); *Cordis*, 1993 WL 723844 at * 3 (citing *Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.*, 607 F.2d 649, 651 (5th Cir.1979)); *Fairchild & Co.*, 516 F.Supp. at 1314 ("The error which would constitute misconduct must not simply be an error of law, but one which so affects the rights of a party that it may be said to deprive him of a fair hearing.")(citing *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3d Cir.1968)).

In *Cordis*, the plaintiff moved to vacate an arbitrator's award for patent infringement. The plaintiff argued that by refusing to admit evidence of tests on the allegedly infringing equipment, the arbitrator had refused to hear material evidence. Before ruling on admissibility of the evidence, the arbitrator heard arguments from both parties as to the relevance of the tests. The arbitrator concluded that the testing evidence was, in part, irrelevant to the issues presented in the arbitration and, in part, cumulative of other evidence. The district court rejected the plaintiff's challenge to these rulings, holding that "neither the arbitrator's refusal to admit irrelevant evidence, nor his refusal to admit cumulative evidence prevented [plaintiff] from receiving a fundamentally fair hearing." *Cordis*, 1993 WL 723844 at *3.

In this case, as in *Cordis*, the panel heard the parties' arguments as to the meaning of the contract terms and the admissibility of evidence describing the parties' understanding of the contract terms during the negotiation. The panel considered LGA's arguments a second time in ruling on the affidavits and a third time in ruling on the motion for reconsideration. The panel consistently concluded that Section 5.05(b) of the Agreement unambiguously permitted Aguaytia to seek credit for a reduction in pipe material used in the project, but limited any claim for credit for undelivered pipe installation services to $500,000.00. An unambiguous contract provision may not be contradicted or varied by external evidence of the parties' contrary or different intent when the agreement was entered. *Wayland Inv. Fund LLC v. Millenium Seacarriers, Inc.*, 111 F.Supp.2d 450, 454 (S.D.N.Y.2000)(citing *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990)).

LGA cites cases in which courts vacated arbitration awards because evidentiary rulings deprived a party of a fair hearing. In *Gulf Coast*, the Fifth Circuit held that an award against an employer should be vacated because the arbitrator had refused to consider a test that showed that a substance found in the discharged employee's car was marijuana. 70 F.3d at 850. The court found that the panel had misled the employer's counsel so that he did not submit the testing evidence as a business record. *Id.* at 849. Unlike *Gulf Coast*, there is no allegation in this case that the panel "tricked" LGA. *See also Iran Aircraft*, 980 F.2d at 146 (vacating award under the New York Convention where one arbitra-

tor had advised plaintiff to submit audit listing individual invoices rather than the invoices themselves and panel later ruled against plaintiff because it had not submitted individual invoices).

Unlike in *Gulf Coast*, in the present case, the panel's ruling that Section 5.05(b) of the Agreement was unambiguous did not turn on the presence or absence of the excluded evidence. Contrary to LGA's argument, the panel's decisions consistently read Section 5.05(b), together with Schedule 5.05(B), as having one meaning. The panel's decisions recognize that if read in isolation, the sentence LGA cited in Section 5.05(b) could support the result LGA advocated, but that if read with Schedule 5.05(B), the provision was susceptible to only one reasonable construction. The panel consistently concluded that the provision was unambiguous, without referring to the parties' subjective intent or understandings in entering the Agreement, but rather to the objective intent revealed by the terms and structure of the Agreement itself. The panel did not reach the question of the parties' subjective intent, which was the subject of the evidence LGA sought to introduce.

In *Tempo Shain*, another case LGA cites, the court vacated an award under section 10(a)(3) of the Federal Arbitration Act because the panel did not continue the proceeding to hear the testimony of a key witness who was temporarily unavailable. The arbitration panel implied in its ruling that it believed his testimony would be cumulative. *Tempo Shain*, 120 F.3d at 19–20. The district court confirmed the award, concluding that the panel correctly understood that it was required to decide whether the testimony would "add to" the panel's knowledge or would be merely cumulative. *Id.* at 19. The Second Circuit reversed, finding that there was no reasonable basis for the panel to find the evidence cumulative and noting that the panel

had not explained the basis for concluding that the evidence would be merely cumulative. The Second Circuit held that the award should be vacated because the panel's refusal to continue the arbitration hearing amounted to fundamental unfairness and misconduct under section 10(a)(3). *Id.* at 20.

*Tempo Shain* teaches that an arbitration panel's understanding of the evidentiary question it must decide is not sufficient to uphold the panel's decision; the panel's answer to the question must find support in the record. *Id.* at 20. In the present case, the panel found that Section 5.05(b) of the Agreement could reasonably be given only one interpretation, when read in the context of the entire Agreement, rather than by isolating a single sentence. The panel explained how the single sentence LGA relied upon fit into the rest of Section 5.05(b) and into the Agreement as a whole. The record offers support for the panel's interpretation of the Agreement as unambiguous and its conclusion that external evidence of the parties' intent was inadmissible to contradict the language of the Agreement.

LGA has failed to show that the panel's exclusion of the evidence as to the parties' intent in agreeing to Section 5.05(b) prevented LGA from receiving a fundamentally fair hearing. This court DENIES LGA's motion to vacate, modify, or amend the section of the award relating to the pipe credit under 9 U.S.C. § 10(a)(3).

## VI. The Claim of Arbitrator Partiality, Nondisclosure, and Misconduct

The arbitration panel consisted of three arbitrators, one appointed by each party, and a chairman, appointed by the International Chamber of Commerce. The Federal Arbitration Act permits a district court to vacate an award for "evident partiality or corruption in the arbitrators." 9 U.S.C.

§ 10(a)(2). LGA asserts "evident partiality" as grounds for vacating the award, including inadequate disclosure of potential conflicts of interest; actual bias; and misconduct by Michael Jaffe, the arbitrator Aguaytia appointed. (Docket Entry No. 30, p. 3).

Jaffe is a partner in the law firm of Arent Fox Kintner Plotkin & Kahn, PLLC ("Arent Fox"). When appointed to the panel in late 1998, Jaffe made the following disclosure to the parties under Article 7 of the ICC Rules of Arbitration:

> While I have never done any work for Aguaytia Energy del Peru or any company associated with it, I am advised that a former partner of mine at Arent Fox, Ms. Coralyn Goode, may have done work for the entity or may have supervised an associate at Arent Fox in doing some work for that entity. So far as I am aware, there has been no work done at Arent Fox for Aguaytia Energy del Peru since Ms. Goode resigned from the firm to relocate to Squire Sanders & Dempsey, LLP. I am advised that El Paso Energy has a minority interest in Aguaytia Energy del Peru and that Ms. Goode did substantial work for El Paso Energy while at Arent Fox. Lastly, I am advised by my partners, Carl Valenstein and Hendrik Gordenker, that since Ms. Goode's departure a limited representation of El Paso Energy has continued with respect to matters wholly unrelated to Aguaytia Energy del Peru or its operations or El Paso Energy's investment in Aguaytia Energy del Peru.

(Docket Entry No. 21, Ex. 3).

LGA did not request further information from Jaffe after receiving this disclosure. During the Phase 1 hearings, LGA did not object to Jaffe or to his conduct in the proceedings. After the panel issued its draft interim award on July 11, 2000, LGA filed a motion with the ICC to challenge and replace Jaffe, to stay the proceedings, and to vacate the award. (Docket Entry No. 21, Ex. 9). LGA asserted that Jaffe had acted inappropriately during the proceedings by interrupting witnesses, interjecting his own opinions, advocating Aguaytia's position, and influencing other members of the panel. (Id.).

In response, the arbitration panel sent a letter to the ICC opposing LGA's challenge to the draft interim award. (Docket Entry No. 21, Ex. 14). The arbitrators noted that LGA had made no objection to the conduct of any arbitrator during the proceedings. (Id., p. 1). The arbitrators stated that "[a]ll three members of the Tribunal participated in every aspect of the proceedings." (Id., p. 2). The arbitrators denied that Jaffe had exerted any improper influence. The arbitrators stated that each member of the panel considered the evidence and that the panel's decision as to every issue was unanimous. The letter described the award as based on "extensive independent consideration by all three members of the Tribunal as well as lengthy discussions among the Tribunal." (Id.). Finally, the arbitrators denied that Jaffe had acted improperly in the proceedings. The arbitrators stated that Jaffe had asked questions and made comments solely to help himself and the other panel members understand the evidence and issues. (Id., pp. 3–4).

On July 20, 2000, LGA sent a letter to the ICC, asserting that Jaffe had failed to disclose the relationship between his law firm, Arent Fox, and one of the parties to the arbitration. The letter concluded that "[Mr. Jaffe's disclosure] did not reveal that he and his law firm actually worked on this project." (Docket Entry No. 21, Ex. 26, quoting July 20, 2000 letter at p. 5).

Jaffe sent a letter to the ICC in response. In the letter, Jaffe explained that before his nomination to the panel by Aguaytia in November 1998, he "had no involvement whatsoever with the Project

and, indeed, had done no work of any kind for [Aguaytia] or El Paso Energy, the entity for which Arent Fox, through my former partner, Ms. Coralyn Goode, had in the past provided legal counsel." (*Id.*, p. 1). Jaffe stated that since his appointment, his "only involvement with the Project has been in my service as an arbitrator." (*Id.*). Jaffe stated that while at Arent Fox, Goode, who had left the firm prior to Jaffe's appointment in 1998, "had acted for El Paso Energy, an investor in the Project ..." and "had been invited to a Management Committee meeting in March 1996 in her capacity as counsel for El Paso Energy." (*Id.*, p. 2). On July 26, 2000, the ICC informed the parties that it had rejected LGA's challenge and decided not to replace the panel. (Docket Entry No. 21, Ex. 9).

In this court, LGA asserts that after the ICC ruled, LGA discovered "new evidence" of the relationship between Arent Fox and El Paso Energy. In 1995, John Hushon, who had been a partner at Arent Fox, became president of El Paso Energy. Hushon had retained Goode, then at Arent Fox, in early 1996. Some of the work Goode did or supervised while at Arent Fox included work on the financing for the project, on behalf of El Paso Energy.

Some of the Arent Fox work included lobbying for legislation to reauthorize the Overseas Private Investment Corp., which later provided certain insurance to the project. (Docket Entry No. 30, pp. 5–6). LGA submits clips of news articles and items appearing on Arent Fox's web page.[13]

LGA asserts that Jaffe failed to make a full disclosure of his firm's connection with the project and with John Hushon at El Paso Energy International Company. (Docket Entry No. 30). LGA asserts that Jaffe's inadequate initial disclosure of the connections among Jaffe, his law firm, his law firm's clients, and the project provide a sufficient basis for vacating the entire award. Alternatively, LGA asks for discovery directed to "Arent Fox, Aguaytia, and Aguaytia's investor El Paso Energy International Company (or its parent or affiliates)" to obtain "documentation of the full extent of Mr. Jaffe's firm's involvement with Aguaytia's investors and with the Aguaytia Project itself." (*Id.*).

Aguaytia opposes LGA's motion for discovery and argues that as a matter of law, no basis to vacate for arbitrator bias, partiality, or misconduct is present. (Docket Entry No. 34). Aguaytia emphasizes that

---

**13.** LGA offers the following excerpts:

... El Paso Energy International Corporation, which will be headed by John D. Hushon as president. El Paso Energy International ... will continue to search out and develop new investment opportunities for the company such as ... the Aguaytia Energy Project in Peru ... Prior to joining EPG in 1995, John D. Hushon was a partner at the law firm of Arent Fox in Washington, D.C.

*El Paso Natural Gas Company Announces a New Business Name, A Restructuring and Senior Management Changes*, Business Wire, Apr. 12, 1996. (Docket Entry No. 31, Ex. 52). "The Aguaytia Energy project illustrates our resolve to increase our investments in unregulated businesses ...," said John Hushon, president and CEO of El Paso Energy

International ... El Paso Energy International is responsible for overseeing the construction of the [Aguaytia] project's power generation station.

*El Paso Energy Corporation Reaches Financial Close on $250 Million Integrated Gas and Power Project in Peru*, Southwest Newswire, Jul. 29, 1996. (Docket Entry No. 31, Ex. 53).

We [Arent Fox] represented El Paso Natural Gas Company, which was the lead participant on the Aguaytia gas and power project. We assisted in obtaining the first preconstruction non-recourse financing for a merchant power plant in the western hemisphere.

Int'l Law Project Financing, at www.arentfox.com/quickguide/businesslines/intllng/intllng.html. (Docket Entry No. 31, Ex. 55).

the undisputed facts show that Jaffe "has never worked for Aguaytia or any associated company such as El Paso" and that Arent Fox "has had no undisclosed contact with either Aguaytia or El Paso since one of its partners left the firm, prior to Mr. Jaffe's appointment as an arbitrator." Aguaytia argues that LGA has not met its burden to show a basis for vacating the award due to Jaffe's failure to make an adequate disclosure or his partiality, or to show a need for discovery. In the alternative, Aguaytia asserts that LGA waived any objection by failing to challenge Jaffe when he made the initial disclosure of the connection between Arent Fox, El Paso Energy, and Aguaytia, and by waiting until after the award to raise the issue for the first time.

Each of these contentions is considered below.

## A. The Standards for Disclosure and Evident Partiality

The Second Circuit has described the balance that must be struck between encouraging disclosure and vacating awards for nondisclosure:

> There is an obvious possibility, alluded to by Justice White in *Commonwealth Coatings* that 'a suspicious or disgruntled party can seize' upon an undisclosed relationship 'as a pretext for invalidating the award.' 393 U.S. at 151, 89 S.Ct. 337. Courts are usually reluctant to impugn the decisions of a jury because of claims of subsequently discovered bias ... and challenges to a judge's impartiality are typically ruled untimely when the complaining party delays an objection past the point at which he is deemed on notice of potentially disqualifying circumstances. Surely, even greater caution is justified when the decision to be set aside is the product of the theoretically informal, speedy, and inexpensive process of arbitration, freely chosen by the parties. Moreover, a

principal attraction of arbitration is the expertise of those who decide the controversy. Expertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it, and the dividing line between innocuous and suspect relationships is not always easy to draw. But as Justice White recognized, an arbitrator 'cannot be expected to provide the parties with his complete and unexpurgated business biography.' 393 U.S. at 151, 89 S.Ct. 337. The very intimacy of the group from which specialized arbitrators are chosen suggests that the parties can justifiably be held to know at least some kinds of basic information about an arbitrator's personal and business connections.

*Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 700–01 (2d Cir.1978)(other internal citations omitted).

In *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), the Supreme Court vacated an award because of the arbitrator's failure to disclose his prior connections with one of the parties. The arbitrator had not disclosed that he had served as a consultant for the party opposing the award and had received approximately $12,000 in fees over four to five years from that representation. *Id.* at 146, 89 S.Ct. 337. The court described the dealings between the arbitrator and the party as "sporadic in that the arbitrator's services were used only from time to time at irregular intervals, and there had been no dealings between them for about a year" but nonetheless "repeated and significant." Some of the arbitrator's undisclosed services were on the projects involved in the arbitration. *Id.* at 146, 89 S.Ct. 337.

In *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 702 (2d Cir.1978), the Second Circuit distinguished *Commonwealth Coatings, Andros*

involved an arbitration between a vessel charterer and owner. The charterer challenged the arbitration award, alleging that the arbitrator had failed to disclose his "close personal and professional relationship" with one of the principals of the firm that actually operated the vessel. The charterer did not accuse the arbitrator of bias or improper conduct, but only nondisclosure. *Andros*, 579 F.2d at 696. Documents submitted in the arbitration showed that the arbitrator had participated in arbitration panels with the principal. The principal submitted an affidavit stating that his relationship with the arbitrator was solely professional and not of a financial, business, or social nature. *Id.* The court noted that the record showed a very limited relationship between the arbitrator and the principal. The charterer had failed to allege or present facts showing that the principal had a direct financial stake in the outcome of the arbitration. *Id.* at 701. The court denied the charterer's request for discovery into the nature and extent of the arbitrator's relationship with the principal and held that the charterer had failed to present "clear evidence of impropriety." *Id.*

## B. The Claim of Inadequate Disclosure

██ In this case, in contrast to both *Commonwealth Coatings* and *Andros*, Jaffe himself did not perform any legal or other work for Aguaytia or for El Paso Energy, an investor in Aguaytia. Jaffe did disclose that his former partner, Coralyn Goode, had done legal work for El Paso Energy and for Aguaytia. Jaffe stated that Arent Fox had not done work for Aguaytia after Goode left the law firm, and while it had continued to do some limited work for El Paso Energy, the matters were unrelated to Aguaytia. The information that LGA subsequently either discovered or appreciated revealed that a former Arent Fox partner was the president of El Paso Energy; Goode's representation of El Paso's interest in Aguaytia included some involvement in the management committee on El Paso's behalf; and Arent Fox had been involved in representing El Paso in issues relating to the Aguaytia project financing and insurance.

A timeline of the relevant events is helpful.

- 1969–present Jaffe worked at Arent Fox in Washington, D.C.

- 1995 John Hushon, a partner in the Arent Fox Washington, D.C. office, leaves Arent Fox and becomes president of El Paso Energy International Corporation.

- 1996 Hushon retains Arent Fox to represent El Paso on work relating to the Aguaytia project. Coralyn Goode is the partner who performs most of the work.

- March 1996 Goode is invited to attend meeting of the Aguaytia management committee in her capacity as counsel for El Paso Energy.

- July 1996 Project financing complete.

- November 1996 Arent Fox involved in lobbying for legislation to reauthorize OPIC, which later provides certain project insurance.

- After Fall 1996 and before November 1998

 Coralyn Goode leaves Arent Fox to become a partner in Squire Sanders, LLP. Arent Fox ceases work on the Aguaytia project.

Arent Fox continues limited representation of El Paso Energy, unrelated to Aguaytia or El Paso's investment in the project.

- September 1998 Lummus files request for arbitration.

- November 1998 Jaffe submits initial disclosure.

- December 1998 Jaffe confirmed as arbitrator.

Jaffe disclosed that his former law partner, Coralyn Goode, had done and supervised "substantial work" for El Paso Energy while at Arent Fox, and that El Paso Energy had a "minority interest" in Aguaytia. Jaffe did not disclose the substance of Goode's or Arent Fox's work relating to the project. Jaffe did not disclose that a former partner of Arent Fox, Hushon, had become president of El Paso Energy in 1995. Jaffe did disclose that after Goode moved to a different law firm, Arent Fox continued to do some work for El Paso Energy, but unrelated to the Aguaytia or El Paso's investment in it.[14]

LGA challenges Jaffe's failure to disclose the substance of the work Goode had done relating to the Aguaytia project or El Paso's investment in the project, over two years before Jaffe was appointed as an arbitrator, and to disclose that Hushon had been a partner at Arent Fox until 1995, when he became president of El Paso Energy. Jaffe did disclose that Goode and Arent Fox may have performed legal work for Aguaytia and had performed "substantial work" for El Paso, which had an interest in Aguaytia. Jaffe investigated the firm's involvement with El Paso after Goode's departure, stating "I am advised by my partners, Carl Valenstein and Hendrik Gordenker, that since Ms. Goode's departure a limited representation of El Paso Energy has continued with respect to matters wholly unrelated to Aguaytia Energy del Peru or its operations or El Paso

14. The parties have not alleged or presented facts showing that Jaffe knew the particular facts as to the substance of the work Goode or others at Arent Fox did relating to Aguaytia. Courts have divided over whether an arbitrator violates his duty to disclose by failing to learn undisclosed facts. The Ninth Circuit held that an award may be vacated where an arbitrator fails to disclose facts that create a "reasonable impression of bias," even if those facts were unknown to the arbitrator because the NASD imposed an independent duty to investigate. *See Schmitz v. Zilveti,* 20 F.3d 1043, 1047 (9th Cir.1994). The Eleventh Circuit and the D.C. Circuit have held that an arbitrator does not have an independent duty to investigate under the FAA and that an award cannot be vacated for nondisclosure where the arbitrator was unaware of the undisclosed facts. *See Gianelli Money Purchase Plan & Trust v. ADM Investor Servs., Inc.,* 146 F.3d 1309, 1312 (11th Cir.1998)(citing *Lifecare Int'l, Inc. v. CD Medical, Inc.,* 68 F.3d 429 (11th Cir.1995)); *Al–Harbi v. Citibank, N.A.,* 85 F.3d 680, 682 (D.C.Cir.1996). This court need not decide whether an award may be vacated for the arbitrator's failure to disclosure facts the arbitrator did not know unless this court first finds that the undisclosed facts show "clear evidence of impropriety," or, at the very least, a reasonable impression of bias.

A rule providing that failure to investigate, alone, could provide grounds to vacate would permit vacatur even where the arbitrator had no connections to the parties or the subject of the arbitration. This result would contradict the central purpose of arbitration, to efficiently and quickly resolve disputes between parties. Although such a rule would encourage arbitrators to investigate potential conflicts, the ethical and procedural rules of arbitration aptly provide that incentive. *Cf. Merit Ins. Co. v. Leatherby Ins. Co.,* 714 F.2d 673, 680 (7th Cir.1983)(distinguishing the American Arbitration Association's commercial arbitration rules and ethical standards applicable to arbitration from grounds for vacating an award under 9 U.S.C. § 10).

Energy's investment in Aguaytia Energy del Peru." (Docket Entry No. 4, Ex. 4).

Neither Hushon nor El Paso was a party to the arbitration. LGA has not alleged or presented facts showing that Hushon, Goode, or Jaffe had any relationship extending beyond having overlapping periods as partners in a law firm. *See Andros,* 579 F.2d at 701 (noting that allegedly undisclosed relationship was purely professional, not financial or social). Jaffe stated that he "had done no work of any kind for [Aguaytia] or El Paso Energy ...." (Docket Entry No. 21, Ex. No. 26, p. 1). Jaffe specifically disclosed that his law firm may have performed legal work for Aguaytia and had performed "substantial work" for an investor in Aguaytia. Although Jaffe did not disclose that the work had involved project financing and insurance, there is no suggestion that the arbitration concerned either of these areas. LGA's allegations of nondisclosure, in light of the information that Jaffe did reveal, are insufficient to warrant vacatur on the basis that the undisclosed facts clearly evidence impropriety, a reasonable impression of bias, or evident partiality.

The Fourth Circuit faced somewhat analogous facts in *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.,* 991 F.2d 141 (4th Cir.1993), and denied a challenge based on evident partiality or bias. In *Peoples,* the arbitrator had failed to disclose his law partner's representation of one of the parties to the arbitration. *Id.* at 145. The partner had signed and filed the complaint while working for a different firm; he had not brought the client with him to the arbitrator's firm. In the present case, while Goode was at Arent Fox, she did "substantial work" representing El Paso Energy, including work relating to its interest in Aguaytia. Arent Fox had ceased to represent El Paso on matters related to Aguaytia years before Jaffe's appointment. Like the arbitrator in *Peo-*

*ples,* Jaffe himself had no involvement in any of the legal work relating to entities involved in the arbitration. Unlike the arbitrator in *Peoples,* Jaffe did disclose that his law firm and former partner had represented an investor in the entity involved in the arbitration and may have done work for the entity itself, ending approximately two years earlier. LGA has failed to allege that either the disclosed or undisclosed facts reveal partiality that is " 'direct, definite and capable of demonstration rather than remote, uncertain and speculative.' " *Peoples Sec. Life Ins. Co.,* 991 F.2d at 146 (citing *Health Servs. Mgmt. Corp. v. Hughes,* 975 F.2d 1253, 1264 (7th Cir.1992)(quoting *Florasynth v. Pickholz,* 750 F.2d 171, 173–74 (2d Cir. 1984))).

LGA did not object or request further information when Jaffe made his disclosure. *See Bernstein Seawell & Kove v. W.E. Bosarge,* 813 F.2d 726, 732 (5th Cir.1987)(rejecting evident partiality challenge and noting that the party "had the obligation to make his objection to the composition of the arbitration panel at the time of the hearing. By not doing so, [the party] waived his right to challenge the selection of the arbitrators."). Aguaytia asserts waiver. LGA argues that it had insufficient information until just before the hearing on Phase 1 to realize that Goode had attended a management committee meeting at the project in March 1996 and did not learn until later that Arent Fox had been involved in lobbying for OPIC. This argument is problematic. Jaffe's disclosure in November 1998 made it clear that Arent Fox and Goode had done work for an investor in Aguaytia, and may have done or supervised work for Aguaytia itself, but provided no details as to the specific substance of that work. The disclosure put LGA "on notice" of the circumstances they now allege are potentially disqualifying—that one of Jaffe's law

partners had done work for Aguaytia itself and "substantial work" for an investor in Aguaytia. *See Bosarge,* 813 F.2d at 732. However, even assuming that LGA did not waive its right to challenge the composition of the panel, this court finds that Jaffe's alleged nondisclosure does not require vacatur.

### C. The Request for Discovery

The parties dispute what standard governs LGA's request for discovery. LGA asserts that it need only show that the requested discovery is "relevant and necessary ... to the determination of Mr. Jaffe's bias and misconduct." (Docket Entry No. 30, p. 7). Aguaytia responds that LGA must demonstrate "clear evidence of impropriety" before discovery is appropriate. (Docket Entry No. 34, p. 1).

 LGA cites *Frere v. Orthofix, Inc.,* 2000 WL 1789641 (S.D.N.Y. Dec.6, 2000). In *Frere,* the district court stated that discovery in a post-arbitration judicial proceeding is available "only in limited circumstances, where relevant and necessary to the determination of an issue raised by [a motion to confirm or vacate an award]." *Id.* at *4 (citations omitted). In *Frere,* however, the court was not confronted with an allegation of arbitrator bias. The court recognized that the more demanding "clear evidence of impropriety" standard applies specifically "to discovery inquiries directed at the arbitrator and only when the goal is to impugn the validity of the arbitrator's decision." *Id.* at * 5 (citing *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.,* 579 F.2d 691, 702 (2d Cir.1978)). The *Frere* court explained the standards for discovery, as follows:

"[I]n view of the narrowness of the grounds on which an arbitral award may be challenged, the need for discovery is typically not nearly as acute as in other civil lawsuits. Necessarily, then, the liberality that normally attends discovery in civil litigation is not appropriate in this context. In addition, any inquiry that is targeted at the arbitrator is particularly suspect, since the arbitrator's coerced involvement in post-award litigation will inevitably intrude upon the arbitrator's quasi-judicial function and discourage qualified individuals from offering their services as arbitrators."

*Id.* (providing examples)(internal citations omitted). The court continued:

In judging discovery requests in this context, the court must weigh the asserted need for hitherto undisclosed information and assess the impact of granting such discovery on the arbitral process. The inquiry is an entirely practical one, and is necessarily keyed to the specific issues raised by the party challenging the award and the degree to which those issues implicated factual questions that cannot be reliably resolved without some further disclosure.

*Id.* at * 5 (citing *Sanko S.S. Co. v. Cook Indus.,* 495 F.2d 1260, 1263 (2d Cir.1973); *National Hockey League Players Ass'n v. Bettman,* 1994 WL 38130, *2–7 (S.D.N.Y. Feb. 4, 1994)).

In applying this analytical framework, this court examines the specific issues LGA raises and the degree to which they implicate "factual questions that cannot be reliably resolved without some further disclosure," to weigh the need for the additional information sought in discovery. *Id.* This approach applies whether the standard for discovery is "relevant and necessary" to a showing of bias, or predicated on a higher threshold showing of "clear evidence of impropriety."

LGA cites cases in which courts have allowed discovery before evaluating a claim of arbitrator bias. In *Sanko S.S. Co., Ltd.,* 495 F.2d at 1262–63, one party alleged that an arbitrator had failed to disclose his company's previous business

connections to the opposing party and its counsel. The Second Circuit noted that the record was unclear as to the nature of the relationship and permitted an evidentiary hearing. In *National Hockey League Players' Ass'n*, 1994 WL 38130 at *5, two hockey players presented disputes under a collective bargaining agreement. The league president resolved the disputes. The players' association sued to set aside the president's decisions, alleging that under the collective bargaining agreement, the disputes should have been settled by an independent arbitrator. The association contended that the league president was biased against players. The court permitted discovery because the record did not explain the league president's responsibilities and duties, his employment history, his *ex parte* contacts with interested parties, or the extent to which any of these would have made him biased against the players. *Id.* at *2.

█ In this case, by contrast, the record is adequate to permit this court to decide the issues presented. The disclosures Jaffe did make, his letters to the ICC, the documents LGA obtained, and the information LGA has presented, present a sufficient record to permit this court to determine the allegations and issues.

LGA does not suggest that Jaffe had any personal involvement with El Paso or Aguaytia. The record does not suggest that Arent Fox's work on the Aguaytia project related to any issue involved in the arbitration. The record does not suggest that Arent Fox had any recent or continuing involvement with Aguaytia or El Paso's interest in Aguaytia. The record does not suggest that Arent Fox had any substantial ongoing representation of El Paso on matters related to the project at the time Jaffe was selected as an arbitrator and made his disclosure to the parties. *See Lyeth v. Chrysler Corp.*, 929 F.2d 891, 899 (2d Cir.1991)(affirming denial of discovery where party had failed to show that arbitrator had any financial or personal stake in outcome); *Andros*, 579 F.2d at 701 (affirming denial of discovery into relationship between arbitrator and principal where record showed extent of relationship was purely professional); *Hunt v. Mobil Oil Corp.*, 654 F.Supp. 1487, 1496 (S.D.N.Y.1987)(denying discovery where record provided adequate factual basis to decide motion).[15]

Unlike the arbitrators in the cases LGA cited, Jaffe was not personally involved with any party to the arbitration and had no identifiable interest in the outcome.

**15.** In *Legion Ins. Co. v. Ins. Gen. Agency, Inc.*, 822 F.2d 541 (5th Cir.1987), the court denied a request for a hearing on motion challenging the arbitration award for an alleged failure to take evidence and miscalculation, stating, "[w]e recognize that some motions challenging arbitration awards may require evidentiary hearings outside the scope of the pleadings and arbitration record." *Id.* at 542–43. The appellant in *Legion* had cited to *Sanko*, 495 F.2d at 1265, and *Totem Marine Tug & Barge, Inc. v. N. Am. Towing*, 607 F.2d 649 (5th Cir.1979), to support its argument that a hearing was required. The court distinguished these cases and stated, in dicta, "[s]uch matters as misconduct or bias of the arbitrators cannot be gauged on the face of the arbitral record alone." 822 F.2d at 543.

This dicta does not establish a per se rule requiring an evidentiary hearing whenever an arbitrator's award is challenged for misconduct or bias. The cases that the court distinguished in *Legion* are also distinguishable from the case before this court. The *Legion* court characterized the record in *Sanko* as "incomplete." *Totem Marine* involved allegations of *ex parte* receipt of evidence, which, by definition, are not in the record of the arbitration, and were not fully set out in the parties' submissions. On the present record, which includes submissions from both parties and the arbitrators themselves, and in the context of the particular allegations of bias and misconduct made by LGA, this court is able to resolve LGA's allegations without an evidentiary hearing.

Jaffe had specifically disclosed that a former partner in his law firm did "substantial work" for an investor in one of the parties. Jaffe's firm had ceased representing the nonparty investor in matters related to the investment long before Jaffe was appointed. This court finds that LGA has failed to allege facts showing a reasonable possibility of bias, much less "clear evidence of impropriety," so as to permit discovery, particularly, when, as here, LGA was on notice of the relationship between Arent Fox, El Paso, and Aguaytia before the arbitration began and sought no other information at the time. This court DENIES LGA's request for discovery and DENIES LGA's challenges for nondisclosure and actual bias.

### D. The Claim of Arbitrator Misconduct

█ LGA also alleges that Jaffe engaged in "partisan behavior" during the arbitration proceedings by interrupting LGA's witnesses, "usurping" the role of chair of the panel, influencing other members of the panel, and advocating Aguaytia's position. (Docket Entry No. 36, pp. 35–36). LGA submitted to the ICC excerpts of the arbitration transcript that LGA identified as examples of Jaffe's partisan behavior. (Docket Entry No. 21, Ex. 8). In a letter to the ICC, the arbitrators denied LGA's allegations and disputed its characterizations of the proceedings. (Docket Entry No. 21, Ex. 14). The arbitrators asserted that they each, independently, evaluated the issues. The arbitrators stated that while Jaffe had played an active role in the proceedings, his questions and comments were solely to assist the panel in understanding the issues and were appropriate to reaching an efficient and fair resolution of those issues. (*Id.*, pp. 3–4). The ICC rejected LGA's challenge. (Docket Entry No. 21, Ex. 9).

In *Fort Hill Builders, Inc. v. Nat'l Grange Mut. Ins. Co.,* 866 F.2d 11 (1st Cir.1989), the court held that an arbitrator's "alleged interruptions and interjections of comments or explanations favorable to [one party] or hostile to [the other party] to the point where [that party's] lawyer felt he was facing an adversary" were insufficient to show evident partiality. *Id.* at 13. The plaintiff argued that the arbitrator's comments were "so strong and frequent that they must have influenced the other arbitrators." *Id.* The court emphasized that the plaintiff did not argue that he "lacked an opportunity to oppose or correct [the arbitrator's] statements or to argue his own views." *Id.* The court held that the complaint should have been raised at the proceeding itself. *Id.* at 13. The court did not rely only on waiver, but also rested on the fact that the arbitrators' decision was unanimous, stating "[t]hat the other panel members were ultimately persuaded by [the arbitrator's] reasoning rather than [the plaintiff's counsel] does not constitute bias." *Id.*

In the present case, as in *Fort Hill Builders,* LGA did not raise any complaint during the hearings as to Jaffe's interruptions, questions, or comments. Instead, LGA waited until it received the adverse draft interim award. (Docket Entry No. 21, Ex. 14, p. 1). LGA should have objected earlier had it felt prejudiced during the proceeding itself. LGA's failure to do so is not, however, the sole basis for this court's rejection of this argument as grounds to vacate the award. As in *Fort Hill Builders,* LGA has not alleged any wrongdoing by the other two members of the panel. *See Fort Hill Builders,* 866 F.2d at 14. LGA has not shown that it lacked the opportunity to respond to Jaffe's comments and questions. A review of the transcript reveals that each of the panel members asked questions of the witnesses, often vigorously. The hearings involved highly technical and detailed subjects, about which the arbitrators had acknowl-

edged substantive expertise and experience, as well as experience as arbitrators. There were a number of sharp disputes and disagreements. The transcript shows that a number of participants interrupted, questioned, and commented. The record does not support LGA's characterization of Jaffe's behavior as improper or as prejudicial.

LGA specifically faults Jaffe for "usurping the role of chair," claiming that Jaffe wrote the draft award. The record does not support this claim. The panel's letter to the ICC clarified that, contrary to LGA's assertion, the chair of the panel did write the draft award. Jaffe merely faxed the copies from his office. (Docket Entry No. 21, Ex. 14). LGA has failed to allege or present facts showing that Jaffe "usurped" the role of chair.

In *Ballantine Books Inc. v. Capital Distrib. Co.*, 302 F.2d 17 (2d Cir.1962), the court rejected a challenge based on misconduct where the arbitrator indicated his tentative views to counsel and encouraged settlement; favored one party's position; and "in effect 'usurped the office of counsel [for that party].'" *Id.* at 20. The court rejected the challenge, noting that by the time the arbitrator expressed his views, he had seen many documents, evidence, and testimony, and the defense had nearly rested. *Id.* Similarly, in this case, the panel received and reviewed volumes of evidence from the parties before the hearings began. (Aguaytia Ex. 14).

The panel characterized Jaffe's questions and comments as being aimed, appropriately, at understanding the issues and affecting an efficient and fair resolution. "A fortiori an arbitrator should act affirmatively to simplify and expedite the proceedings before him, since among the virtues of arbitration which presumable have moved the parties to agree upon it are speed and informality." *Ballantine*, 302 F.2d at 21 (citations omitted). "It is to be

expected that after a judge or an arbitrator has heard considerable testimony, he will have some view of the case. As long as that view is one which arises from the evidence and the conduct of the parties it cannot be fairly claimed that some expression of that view amounts to bias." *Id.; see also Fairchild & Co., Inc. v. Richmond, Fredericksburg & Potomac R.R. Co.*, 516 F.Supp. 1305, 1313 (D.D.C.1981)(stating that arbitrators are expected to develop opinions during course of arbitration, and to "act affirmatively to simplify and expedite the proceedings" before them)(citing *Ballantine*, 302 F.2d at 21). "[A]n arbitrator's legitimate efforts to move the proceedings along expeditiously may be viewed as abrasive or disruptive to a disappointed party. Nevertheless, such displeasure does not constitute grounds for vacating an arbitration award." *Fairchild & Co.*, 516 F.Supp. at 1313.

The panel reached a unanimous decision. When challenged, Rubin and Overcash, the other panel members, experienced arbitrators and experienced and knowledgeable lawyers in the area of construction contracts, defended the process and the results reached. The transcript supports their description of the process and of Jaffe's role in it. This court finds that LGA has failed to allege or present facts showing that Jaffe's conduct rose to the level of evident partiality or provides a basis for vacating the award.

This court DENIES LGA's motion to vacate the award based on arbitrator misconduct and evident partiality.

## VII. The Panel's Refusal to Incorporate the Parties' Stipulation

On December 11, 2000, the parties signed a stipulation reflecting their agreement that Aguaytia owed LGA specific payments and credits. The stipulation it-

self was not then submitted to the panel. The panel issued its Final Award on April 23, 2001. In May 2001, the parties entered a stipulation under which they agreed that "the following agreed Items and credited party, Amounts and Payment Due Dates should be made a part of the Final Award, and should be used for purposes of establishing a Project Account Balance and calculating preaward and postaward interest." (Docket Entry No. 36, Ex. C). The net effect of the stipulation was that Aguaytia owed LGA $5.2 million. In June 2001, the parties filed a Joint Application for Correction of Final Award, asking the panel "to approve the Stipulation or its substantive provisions as an addendum to the Final Award," under Article 29 of the ICC Rules of Arbitration.[16] (Docket Entry No. 36, Ex. C). In the Joint Application, the parties stated that some, but not all, of the stipulated items were listed in the Terms of Reference as "issues the Tribunal was to resolve." The parties did not identify which were included and which were not.[17] The parties stated that they had reached an agreement as to all the items addressed in the stipulation.

On September 4, 2001, the panel issued an addendum to the Final Award, denying the parties' Joint Application to correct the award. (Docket Entry No. 52, Ex. 73). The panel stated as follows:

In their Joint Application the parties ask the Tribunal to supplement the Final Award by including in it the contents of a Stipulation executed by the parties in May 2001. As the matters contained in the May 2001 Stipulation were resolved by the parties and not subject to resolution by the Tribunal, there is no proper basis for "correcting" or "interpreting" the Final Award. Accordingly, no revision to the Final Award will be made on the Joint Application.

(*Id.*, p. 2).

LGA asserts that the entire award must be vacated because the panel refused to

---

**16.** Rule 29, "Correction and Interpretation of the Award," provides:

(1) On its own initiative, the Arbitral Tribunal may correct a clerical, computational or typographical error, or any errors of similar nature contained in an Award, provided such correction is submitted for approval to the Court within 30 days of the date of such Award.

(2) Any application of a party for the correction of an error of the kind referred to in Article 29(1), or for the interpretation of an Award, must be made to the Secretariat within 30 days of the receipt of the Award by such party, in a number of copies as stated in Article 3(1). After transmittal of the application to the Arbitral Tribunal, it shall grant the other party a short time limit, normally not exceeding 30 days, from the receipt of the application by that party to submit any comments thereon. If the Arbitral Tribunal decides to correct or interpret the Award, it shall submit its decision in draft form to the Court not later than 30 days following the expiration of the time limit for the receipt of any comments

from the other party or within such other period as the Court may decide.

(3) The decision to correct or to interpret the Award shall take the form of an addendum and shall constitute part of the Award. The provisions of Articles 25, 27 and 28 shall apply *mutatis mutandis*.

**17.** The parties requested the panel to consider the effect of the proposed addendum on footnote 2 and footnote 8 of the Final Award. In footnote 2, the panel concluded that it had insufficient evidence or argument to make an award on the particular credits and invoiced amounts included in the stipulation. The panel stated, "[c]onsequently, our award does not include a complete definition of the final amount of funds payable from one party to the other since that involves issues not determined in this proceeding." (Docket Entry No. 36, Ex. B, p. 3 n. 2). In footnote 8, the panel discussed the amounts due as shown in specific invoices and stated that "[n]ot included herein is the amount of the invoices to which the parties agreed in their Stipulation of December 11, 2000." (*Id.*, p. 35 n. 8).

incorporate the parties' joint stipulation. LGA argues that the panel's refusal violates the FAA and that vacatur is the exclusive remedy. Aguaytia responds that its motion to enforce the award effectively recognizes the stipulated amounts as an offset reducing the judgment and that the panel's ruling is not a ground for vacating the entire award.

The procedural posture this issue presents is unusual. Both sides agree that a judgment enforcing the award, without including the stipulated amounts as a setoff or credit, would be excessive. Both sides agreed to have the arbitration panel make the adjustment, in an agreed amount. The panel declined to do so. The first issue before this court is whether the panel's refusal exceeded its authority, requiring this court to vacate the entire award, as LGA asserts.

LGA cites ICC Rule 26 to support its argument that the panel exceeded its authority and engaged in "deliberate misconduct" by refusing to incorporate the parties' settlement as to the issues addressed in the stipulation.[18] However, as Aguaytia notes, the parties did not request entry of a settlement under Rule 26. Instead, the parties requested a correction under Rule 29. LGA does not identify authority under which the panel could have recorded the stipulation as a settlement under Rule 26, absent a specific request from the parties to do so. This court finds that the panel did not exceed its authority or engage in misconduct by refusing to record the stipulation as a settlement.

LGA simultaneously argues that the panel exceeded its scope of authority by deciding matters as to which the parties had agreed and that the panel exceeded the scope of its authority by refusing to include in their decision matters as to which the parties had agreed. LGA asserts that the parties had discussed their resolution of the issues addressed in the December 2000 and May 2001 stipulations during the arbitration hearings. LGA specifically refers to Hearing Exhibit H–62, "the Project Account Balance," and asserts that this exhibit reflected the parties' agreement as to particular issues which the arbitrators should not have decided, but should have incorporated into the arbitral award.

Aguaytia disputes LGA's characterization of the exhibit and the parties' presentation to the panel during the proceedings. (Docket Entry No. 43, p. 2). Aguaytia asserts that Exhibit H–62 was an agreed summary of the parties' respective positions, not a stipulation resolving specific issues to be included in the Final Award. (Id., pp. 3, 5). Aguaytia argues that the parties introduced Exhibit H–62 to identify the disputed issues the panel needed to resolve and the settled issues the parties had already resolved. Aguaytia asserts that Exhibit H–62 included certain amounts and dates that were undisputed, never contested, and never presented to the panel for resolution, as well as vigorously disputed issues that the panel did hear and resolve. (Docket Entry No. 43, p. 2). When the parties submitted Exhibit H–62, the chairman of the panel stated: "[T]his will be a very important document. I want to be exactly sure what the parties agree on and what they disagree on. Obviously we'll decide what they disagree on." (Aguaytia Ex. 40, p. 1161, lines 15–18). LGA did not object to this characterization of Exhibit H–62. Aguaytia also points out that in the Terms of Reference,

---

**18.** Rule 26, "Award by Consent," provides:

If the parties reach a settlement after the file has been transmitted to the Arbitral Tribunal in accordance with Article 13, the settlement shall be recorded in the form of an Award made by consent of the parties if so requested by the parties and if the Arbitral Tribunal agrees to do so.

the parties did not request the arbitration panel to find any of the amounts and terms set out in the stipulation, or to find that Aguaytia owed LGA a net amount of $5.2 million. (Docket Entry No. 43, p. 5).

Aguaytia acknowledges that the panel could have included the stipulated amounts in its Final Award. Aguaytia argues that the parties did not dispute the amounts owed and credits due and did not include issues as to the stipulated amounts in the Terms of Reference. Because the panel's obligation was to resolve disputed matters, Aguaytia argues that the panel did not err in declining to include stipulated, undisputed amounts in the award. (Docket Entry No. 43, p. 3).

LGA cites *Delta Queen Steamboat v. Dist. 2 Marine Eng'rs Ben. Assoc.*, 889 F.2d 599 (5th Cir.1989) and *HMC Mgmt. Corp. v. Carpenters Dist. Council of New Orleans and Vicinity*, 750 F.2d 1302 (5th Cir.1985). In both cases, the arbitrator entered an award in favor of an employee, despite a finding that the employment contract justified the employer's action. The Fifth Circuit vacated the award as contrary to either the express provisions or the essence of the parties' arbitration contract. The court stated the clear rule that arbitrators are bound to the terms of the parties' agreement in entering awards and may not displace or replace those terms based on the panel's own sense of justice or fairness. Those cases, and that rule, do not address the issue this case presents. LGA has not identified a contractual provision that required the panel to include in their award amounts or issues that the parties had already resolved, outside the arbitration process. LGA has not identified a contractual provision that prevented the panel from making an award that did not include terms or amounts that the parties had settled, outside the arbitration process. *See Valentine Sugars, Inc. v. Donau Corp.*, 981 F.2d 210, 213 (5th Cir.1993)(distinguishing *Delta Queen* where party had not identified contractual provision that removed the issue decided from the arbitrator's review).

LGA also cites *Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.*, 607 F.2d 649, 651 (5th Cir.1979). In *Totem*, the parties to a vessel charter agreement submitted to arbitration an itemized damages claim. The panel awarded damages that were not requested. 607 F.2d at 652. The district court confirmed the award; the Fifth Circuit reversed and vacated.[19] In *Totem*, the panel awarded damages beyond those requested. In this case, by contrast, the panel refused to include undisputed payments and credits in its completed resolution of disputed liability issues and damages amounts. *Totem* does not support the result of vacating the award, as LGA requests.

"Arbitration is contractual and arbitrators derive their authority from the scope of the contractual agreement." *Totem*, 607 F.2d at 651 (citing *Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. 1358). "Parties to an arbitration may stipulate the issues they want determined and increase or limit the arbitrator's contractual authority by their express submission." *Am. Postal Workers Union v. Runyon*, 185 F.3d 832, 835 (7th Cir.1999)(quoting *Hill v. Staten Island Zoological Soc'y, Inc.*, 147 F.3d 209, 214 (2d Cir.1998)). In this case, the Terms of Reference did not expressly request the panel to enter findings as to the stipulated amounts.[20] The parties did not submit the

---

**19.** The award was vacated under 9 U.S.C. § 10(d), the predecessor to § 10(a)(4).

**20.** LGA requested the panel to find that Aguaytia was wrongfully withholding the agreed amounts to offset liquidated damages that LGA claimed it did not owe. The panel found that LGA owed $6.7 million in liquidated damages, making LGA's argument as to wrongful withholding moot.

stipulation to the panel before the award issued. While the parties referred to some, but not all, of the amounts and dates included in the stipulation during the arbitration proceedings, the record does not show that the parties expressly requested the panel to include the stipulated amounts in the award before the panel issued the Final Award.[21] It was not until after the Final Award issued that the parties requested the panel to "correct" the award by including the stipulated amounts. The panel addressed the narrow question of its own authority under the ICC rules to correct the award. The panel found that under those rules, it lacked the authority to "correct" or "interpret" the Final Award to include matters that the parties had resolved by agreement, outside the arbitration process, and had not submitted to the panel.

LGA argues that the panel refused to consider evidence by refusing to incorporate the stipulated amounts, warranting vacatur of the entire award. The issue is not, however, one of admissibility of evidence timely submitted during the proceedings. The arbitrators addressed and resolved the disputed issues submitted to them, based on the evidence submitted before the Final Award issued. After the panel issued the Final Award and the parties submitted the stipulation, the panel found that it lacked sufficient information to change the Final Award in the manner and at the time the parties filed their request. LGA has failed to present or allege facts showing that the panel refused to consider evidence during the arbitration

proceeding so as to make the proceedings fundamentally unfair.

LGA also argues that the panel's refusal to incorporate the stipulated amounts to reduce the size of the award results in an award that is not "mutual, final, and definite," as required by 9 U.S.C. § 10(a)(4). LGA argues that the panel left open the effect of the stipulated credits on the Final Award. In support, LGA submits the affidavit of William Huth as an expert on ICC arbitration. Huth states that the panel's refusal to reduce the award by the amounts both parties stipulated was an abuse of the panel's authority and that vacatur is the proper remedy.[22] (Docket Entry No. 52, Ex. 74).

Aguaytia responds that the panel's refusal to incorporate the stipulated amounts into the Final Award is not a failure to resolve all issues submitted to the panel. "Aguaytia's responsibility for these amounts was 'resolved' well in advance of the Final Award, when Aguaytia agreed that LGA was entitled to be credited for them." (Docket Entry No. 54, p. 3). Aguaytia acknowledges that it owes LGA the stipulated amounts. (*Id.*). Aguaytia included the stipulated amounts in its proposed final judgment, as an offset that reduces the amount of the Final Award, noting that LGA has not challenged Aguaytia's calculation of the net amount LGA owes. (*Id.*). LGA's argument is not a basis for vacating the entire award, but rather to vacate the panel's refusal to determine the effect of the stipulation on the Final Award, and to remand for the limit-

---

21. *See, e.g.,* Docket Entry No. 40, Ex. 60, Transcript, vol. 1 pp. 11–24, vol. 6 pp. 1151–57.

22. Huth is an attorney who has practiced international commercial dispute resolution for twenty years, has appeared before numerous arbitration panels, served as an arbitrator, and taught a law school seminar on in-

ternational commercial arbitration. Huth testified as to his understanding of the law. However, expert testimony offering a legal opinion is generally inadmissible. *See Estate of Sowell v. United States of America*, 198 F.3d 169, 171–72 (5th Cir.1999); *Askanase v. Fatjo*, 130 F.3d 657, 669 (5th Cir.1997); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).

ed purpose of making that determination. If, as Aguaytia argues, the effect of the stipulation is simply that of an offset in an undisputed amount, the issue on remand is narrow, specific, and simple.

LGA argues that Aguaytia's position would require this court to modify the award beyond the statutory authority to do so. Aguaytia responds that this court has the authority to confirm the entire award but to enter a final judgment that incorporates the stipulated amount as an offset or to modify the award to include the stipulated amount as an offset.

The FAA provides the following authority for district courts to modify an award:

In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

9 U.S.C. § 11.

Aguaytia argues that this court has the authority to modify the Final Award to include the stipulation under 9 U.S.C. § 11(c), which permits modification of an award that is "imperfect in a matter of form not affecting the merits of the controversy," and under the general provision stating that "[t]he order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties." (Docket Entry No. 54, pp. 3–4). Aguaytia asserts that "[c]rediting LGA for the agreed amounts does not affect the merits of the controversy since these amounts are not contested and all that is required to incorporate them is a mathematical calculation previously agreed to by the parties." (*Id.* at n. 3).

In *Diapulse Corp. of Am. v. Carba, Ltd.,* 626 F.2d 1108, the district court found that an arbitrator's award enforcing a noncompetition agreement violated public policy because the award failed to include geographic or temporal limits. The district court modified the award under section 11(c) to include geographic and temporal limitations. The Second Circuit reversed, holding that the district court's conversion of a very broad noncompetition injunction into a relatively narrow one affected "matters of substance that were at the heart of the controversy between [the parties]." *Id.*

In *Diapulse,* only one party sought a modification to the arbitrator's award. In this case, by contrast, both parties requested the panel to modify the award and agreed as to how the award should be modified. The stipulated amounts are not "at the heart of the controversy" between the parties, in the sense that the parties agreed as to the amounts and due dates set out in the stipulation, while continuing to dispute issues before the arbitration panel. However, the stipulation obviously will affect the amount of the award. The panel itself noted its uncertainty as to the effect of the stipulation on the final amount owing between the parties. (Docket Entry No. 36, Ex. B, p. 3 n. 2, p. 35 n. 8).

LGA relies on *Katz v. Feinberg,* 167 F.Supp.2d 556 (S.D.N.Y.2001), to support its argument that this court lacks authority to offset the award by the stipulated

amounts. In *Katz*, the plaintiff, the prevailing party in an arbitration, moved to confirm the arbitration award. The party opposing the award had filed a separate arbitration proceeding against the plaintiff, seeking payment of litigation expenses. The party opposing the award argued that under the parties' agreement, he had a right to offset the amount owed under the award by the amount of the litigation expenses he incurred. However, the separate proceeding to resolve the litigation expenses had not concluded. The dispute as to those litigation expenses had not been submitted as part of the arbitration that resulted in the award. The court confirmed the award without resolving the disputed issues as to the litigation expenses and without including an offset for those expenses. *Katz*, 167 F.Supp.2d at 573.

The circumstances of *Katz* are quite different from those in the present case. In the present case, the parties filed a joint request to the panel to reduce the amount of the Final Award by the stipulated amounts as a net credit from Aguaytia to LGA, offsetting the amount LGA owed Aguaytia under the Final Award. Neither party disputes the amounts or Aguaytia's obligation to pay LGA the net stipulated amount. LGA has not challenged the method by which Aguaytia calculated the amount of the judgment that would result from modifying the award to include the net stipulated amount. However, *Katz* and other cases emphasize the limited role a court plays in resolving motions to confirm, or modify, arbitration awards:

> This case was brought as a petition to confirm an arbitration award. As such, this Court's role is limited to reviewing the parties' challenges to the arbitrator's decision. As [the party opposing modification] points out, "[a]ctions to confirm arbitration awards ... are straightforward proceedings in which no other claims are to be adjudicated."

167 F.Supp.2d at 572 (quoting *Ottley v. Schwartzberg*, 819 F.2d 373 (2d Cir.1987), and citing *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir.1984)("[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.")).

Aguaytia's argument that the modification it seeks would not change the award in a manner that affects the merits of the disputed issues between the parties is supported by the lack of dispute over the items and amounts of credits and payments in the stipulation. However, the defect in the award that the parties assert is not merely one of form; it is a $5.2 million net sum, composed of a number of specific payment and credit items. The modification would not effectuate the panel's intent in issuing the award. The panel was clear that it did not intend to include the stipulated amounts in the award. The panel was clear that it lacked sufficient information to determine the relationship between the stipulated items and the items resolved in the award. The panel did not intend to issue an award that would completely define "the final amount of funds payable from one party to the other since that involves issues not determined in this proceeding." (Docket Entry No. 36, Ex. B, p. 3 n. 2).

This court concludes that it can neither vacate the entire award because it does not include the stipulation, nor, on the present record, modify the award to incorporate the stipulation. This court DENIES the motion to vacate the award on the basis of the panel's refusal to include the effect of the parties' stipulation. This court finds that the panel's refusal to incorporate the stipulation after the Final Award had already issued is not a basis to vacate the award as a whole or to vacate any specific provision of the award. However, because

the panel did not address the effect of the parties' stipulation on the amounts established by the award, and because this court cannot do so, this court REMANDS, in part. Specifically, this court remands the issue of the effect on the Final Award of the parties' stipulation that Aguaytia owes LGA a net amount of $5.2 million. The remand is to the International Chamber of Commerce, to permit resolution consistent with the parties' broad contractual agreement to submit all disputes to binding arbitration.[23]

This court DENIES LGA's motion to vacate the entire award or any specific aspect of the award, except for the panel's refusal to determine the effect of the stipulation. This court REMANDS to the International Chamber of Commerce the narrow, specific, and limited issue of the effect of the parties' stipulation on the amounts owed between the parties under the award.

## VIII. The Challenge to the Award of IGV Taxes

The Final Award grants Aguaytia reimbursement for different categories of IGV taxes.[24] The categories include IGV taxes related to amounts Aguaytia has paid or will pay to remedy defects in LGA's work; amounts Aguaytia paid LGA for pipe that LGA did not install or purchase; and amounts Aguaytia has paid or will pay for "services provided by counsel and consultants." (Docket Entry No. 36, Ex. B, pp. 38–39). LGA argues that the panel exceeded its authority, made an award contrary to the essence of the Agreement, and displayed manifest disregard for New York law, by including amounts for the IGV taxes in the Final Award. LGA raises several arguments to support its claim.

▮ LGA argued before the panel, and argues again in this court, that under specific provisions of the Agreement, Aguaytia was responsible for all IGV taxes. (Docket Entry No. 39, pp. 25–26). The panel interpreted the Agreement sections that specifically addressed IGV Taxes.[25] In the

---

**23.** Aguaytia requested that if this court found that it lacked authority to modify the award as requested, to confirm the remainder of the award and remand for further arbitration the parties' dispute as to the effect that should be given to the stipulation. (Docket Entry No. 54, pp. 4–5)(citing *Puerto Rico Maritime Shipping Auth. v. Star Lines Ltd.*, 454 F.Supp. 368, 372–73 (S.D.N.Y.1978)).

**24.** Aguaytia provided the following explanation of the IGV tax:

The IGV Tax is an 18 percent value-added tax (VAT) on certain goods and services furnished in Peru. Under the Peruvian tax system, a company like Aguaytia is both a payor and a collector of IGV taxes. When Aguaytia pays someone for goods or services provided to it, e.g., a contractor, Aguaytia must also pay the contractor the related IGV Taxes. The contractor, in turn, must remit this amount to the Peruvian government. Likewise, when Aguaytia is the provider of goods or services, e.g., when it acts as a subcontractor or sells liquids or electricity to a third party, Aguaytia must

collect the taxes due and remit them to the government.

Aguaytia is not necessarily required, however, to remit physically money that it collects from purchasers of its goods and services. Under the IGV Tax system, most of Aguaytia's payments to third parties (except about 3 percent) create a "bank" of credits. IGV Taxes Aguaytia is required to collect from others do not physically have to be remitted to the government to the extent that Aguaytia's "bank" of credits exceeds the amount Aguaytia would otherwise be required to remit. The effect is the same as a payment, however, because the "bank" is reduced by the amount not remitted. Aguaytia is currently a net payor (because of the IGV Taxes is paid for the construction of the project) and, thus, has a substantial "bank" of credits that it can use to avoid out-of-pocket tax payments.

(Docket Entry No. 43, pp. 7–8).

**25.** LGA has identified the following provisions in the Agreement that address IGV taxes:

- 2.01(b): "In no event shall Contractor be liable for the payment of IGV Taxes pay-

Final Award, the panel concluded that the Agreement sections did not address additional IGV tax liability that Aguaytia would incur by paying for work necessary to repair LGA's defective work. The panel also concluded that the Agreement did not address the IGV tax aspect of an award requiring LGA to reimburse money that Aguaytia had already paid for pipe installation and purchase, on which Aguaytia had paid LGA IGV taxes. The panel's interpretation of the text of the Agreement does not present a basis for vacating or modifying the award.

LGA specifically argues that IGV taxes are consequential damages, excluded by Section 20.02 of the Agreement, and that the panel's decision manifestly disregarded New York law. Section 20.02 provides:

> Waiver of Certain Damages. Each of Company and Contractor hereby waive any and all right to recover (whether by claims based in contract, tort or strict liability), from the other any consequential, punitive, or exemplary damages (including loss of profits or revenues), in each case based upon, arising out of, or attributable to this Agreement or any

breach or alleged breach of the other party under this Agreement.

Aguaytia argues that IGV taxes are "a direct expense incurred in connection with the billing for the work performed," and "an integral and direct cost of the service." (Docket Entry No. 43, p. 8).

During the arbitration, the parties devoted several days of hearings to the IGV tax issues. (Docket Entry No. 43, p. 9). The panel agreed with Aguaytia that the IGV taxes that Aguaytia incurred in paying to remedy defects in LGA's work were direct, not consequential, damages. (Docket Entry No. 36, Ex. B, p. 38). LGA argues that this interpretation of the Agreement and the nature of the damages manifestly disregards New York law.

The cases LGA cites do not show that the IGV taxes, as a matter of law, are so clearly consequential damages as to make the basis of the panel's contrary conclusion manifest disregard for the law. LGA cites *New York Marine & Gen. Ins. Co. v. S/S Ming Prosperity*, 920 F.Supp. 416 (S.D.N.Y.1996) and *Farrar v. Brooklyn Union Gas Co.*, 73 N.Y.2d 802, 537 N.Y.S.2d 26, 533 N.E.2d 1055 (1988) in

able by Company under Law, except the obligation to remit such amounts collected from Company to the applicable Governmental authority."

- 4.04(b): "Contractor shall provide to Company ... Contractor's estimate of the import taxes, and, if applicable, IGV taxes payable with respect to Material and Equipment ...."
- 4.04(c): "Company shall pay Contractor the Import Taxes (and IGV taxes, if applicable) related to the importation of Material and Equipment so long as Company receives at least ten (10) Business Days advance notice ...."
- 11.02(a)(ii): Contractor shall submit invoices for "all IGV Taxes that Contractor is required to collect from Company under the IGV Law ...."
- 11.02(c): Contractor shall provide invoices including all "itemized credits for

all of the progress payments ... including all Import Taxes and IGV taxes paid by Contractor pursuant to Section 4.04(c)."

- 11.10(a): "Company shall pay (i) all IGV Taxes that Contractor is required to collect from Company under the IGV law and any fines and penalties that are to be paid under the indemnification obligation of the Company under Section 19.01(c) ...."
- 19.01(c): "Company agrees to defend and indemnify Contractor from any IGV Taxes (and related penalties and interest) that Contractor, through compliance with Section 2.01 and *Schedule 2.01* and *Schedule 2.11*, did not charge the Company, if under applicable law it is determined that IGV Taxes should have been charged by Contractor to Company."

(Docket Entry No. 39, pp. 25–26).

support of its consequential damages argument. However, neither case involved a value-added tax. In *S/S Ming,* an action brought to recover for nondelivery of cargo shipped from overseas and destroyed during inland railroad carriage, the court held that lost profits and bank fees were consequential damages and could not be recovered because the bill of lading precluded recovery of "any loss of profit or any consequential loss." 920 F.Supp. at 423–24. In *Farrar,* a wrongful death action, the administrator of the estate argued that if the deceased had lived five years longer, the estate would have received the full benefit of a federal estate tax credit and avoided all federal estate tax liability. The administrator asked the court to award the loss of the tax credit as an element of consequential damages resulting from the defendant's negligent act that had caused the death. The court rejected the claim, but on the ground that the estate's ability to qualify for the tax credit, even absent the defendant's negligence, was speculative and uncertain, "dependent on future changeable events." *Farrar,* 537 N.Y.S.2d 26, 533 N.E.2d at 1055.

LGA cites no New York or other authority that undermines the panel's interpretation of the Agreement, in light of the record evidence as to the nature and source of the specific categories of IGV tax liability. This court finds no basis in the record to hold that the panel manifestly disregarded the law or violated the "essence" of the Agreement in concluding that IGV taxes related to Aguaytia's payment for work necessary to repair LGA's defective work, or related to the reimbursement of Aguaytia's pipe payments, were direct rather than consequential damages.

 LGA also challenges the panel's inclusion of IGV taxes for attorney and consulting fees awarded under Section 24.02 of the Agreement. LGA argues that these categories of IGV taxes are consequential damages, precluded by Section 20.02. Section 24.02 of the Agreement provides:

> The arbitrators shall determine who is the prevailing party and shall award attorney fees ... to the prevailing party ... Fees and expenses associated with arbitration (including the cost of such arbitration) under this Section 24.02 will be paid by each party unless otherwise determined by the arbitrators.

The panel characterized as "direct costs" the IGV taxes that Aguaytia incurred as part of the fees and expenses it paid for the services its attorneys and consultants provided associated with the arbitration. The issue was not whether the IGV taxes for attorney and consultant fees were direct or consequential damages. The panel concluded that this category of IGV taxes was not an element of damages at all, but rather an element of the underlying fees and expenses. (Docket Entry No. 36, Ex. B, p. 39). LGA has failed to show that the panel exceeded its authority or manifestly disregarded applicable law in including the IGV taxes incurred in connection with attorney and consultant fees and expenses as part of those fees and expenses.

 LGA also argues that the award must be vacated under 9 U.S.C. § 10(a)(4) because the panel awarded the IGV taxes for undetermined sums that have not yet accrued and, according to LGA, may never accrue. During the arbitration, the parties disputed whether, as to some of the IGV taxes, Aguaytia would be able to credit IGV taxes it had previously paid against IGV tax obligations that would come due in the future from its own sales in Peru. The parties also disputed whether Aguaytia would have to pay IGV taxes for services provided by vendors located outside Peru, including its attorneys. As to the IGV taxes relating to amounts Aguaytia

paid to repair LGA's defective work, Aguaytia had not issued all the invoices on work necessary to repair or remedy defects in LGA's performance, and had not calculated the IGV taxes that would be incurred. Finding that it could not determine the amount of IGV taxes that Aguaytia would actually pay in the future, for which it would not receive a "credit," and which it should be permitted to recover from LGA, the panel declined to award Aguaytia a definite amount in IGV taxes. Instead, the panel entered specific orders as to the different categories of IGV taxes.

As to IGV taxes related to amounts Aguaytia had paid or would pay to remedy LGA's defective work, the panel stated that:

> If, in fact, [Aguaytia] will have to pay the amount of such taxes and any interest and penalties to [Aguaytia]. LGA shall so reimburse [Aguaytia] within thirty (30) days of the date on which [Aguaytia] first presents proof to LGA of [Aguaytia's] payment to the tax authorities. Any amounts not paid within thirty (30) day period shall accrue interest as provided in the Agreement until paid in full.

(Docket Entry No. 36, Ex. B, p. 38).

As to IGV taxes relating to Aguaytia's payment of attorney fees, costs, and expenses relating to the arbitration, the panel ordered LGA to:

> reimburse [Aguaytia] for the IGV taxes paid by [Aguaytia] upon proof (1) that [Aguaytia] has actually paid those taxes and cannot recover the amounts paid as a credit against future IGV tax obligations and/or (2) that [Aguaytia] has paid those amounts and the recovery as credit against future IGV taxes results in a loss of the time value of the funds expended. LGA shall make the payment(s) to [Aguaytia] within thirty (30) days of the date on which [Aguaytia] provides proof as described above.

Thereafter [Aguaytia] shall be entitled to interest on the amount that LGA is required to pay as provided in Section 24.02 of the Agreement.

(Docket Entry No. 36, Ex. B, p. 40).

The panel did not describe the nature of the "proof" Aguaytia would be required to present to make the necessary showings. The panel did not describe how the parties were to resolve questions as to which payments resulted in a "credit" toward future tax obligations. The panel did not identify a formula and/or rate to be used in calculating the "loss of the time value of the funds expended" and did not require a particular form of proof of such loss. LGA asserts that these open issues make this aspect of the award indefinite and unenforceable.

As a general rule, a final and definite arbitration award "must both resolve all the issues submitted to arbitration, and determine each issue fully so that no further litigation is necessary to finalize the obligations of the parties under the award." *Puerto Rico Maritime Shipping Auth. v. Star Lines Ltd.*, 454 F.Supp. 368, 372 (S.D.N.Y.1978), *disagreed with on other grounds by, Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 415 n. 5 (2d Cir.1980). LGA cites to *Coopertex Inc. v. Rue De Reves Inc.*, 1990 WL 6548 (S.D.N.Y. Jan.22, 1990) and *Cofinco, Inc. v. Bakrie & Bros., N.V.*, 395 F.Supp. 613 (S.D.N.Y.1975), to support its argument that the present award is not final and definite.

In *Coopertex*, the arbitration involved a seller's claim that a buyer had improperly rejected a delivery of goods. The arbitrators awarded the seller a sum certain for the goods and ordered the seller to ship the goods to the owner. The buyer was to bear the costs of warehousing and shipping the goods. *Coopertex*, 1990 WL 6548 at *1. The buyer sought to vacate the award

because the panel had not specified the amount of the costs. The seller argued that any dispute as to the amount of the warehousing and shipping costs could be resolved by future arbitration. The court vacated the costs portion of the award as not "definite" under 9 U.S.C. § 10.

Similarly, in *Cofinco,* a court vacated an arbitration award for the purchase price paid for contaminated coffee. The award included a provision for the payment of "accrued expenses" and interest "at the average prime rate." 395 F.Supp. at 615. One basis for the court's decision to vacate was the panel's failure to make a "mutual, final, and definite award" under 9 U.S.C. 10(d). *Id.* at 616. The court stated, "[i]t is not sufficient to leave open matters like 'accrued expenses,' interest, and the like, which could entail large sums and disagreements confided to the arbitral jurisdiction." *Id.*

Aguaytia cites *Flender Corp. v. Techna–Quip Co.,* 953 F.2d 273 (7th Cir.1992) and *Gerling Global Reins. Corp. v. Yasuda Fire & Marine Ins. Co., Ltd.,* 1999 WL 553767 (S.D.N.Y. July 12, 1999), to support its argument that the panel appropriately left open the amount of the IGV taxes LGA would have to pay. Aguaytia argues that the panel "specified with particularity the formula the parties must apply in the future to decide the issue when payment, if any, becomes ripe." (Docket Entry No. 43, p. 11). In *Flender,* the arbitrators awarded commissions to a sales agent who claimed that a manufacturer had wrongfully terminated the sales agency contract, but did not specify the amount of such commissions. The manufacturer moved to vacate the arbitration award for indefiniteness. The district court confirmed the award, and the Second Circuit affirmed. The court explained that the arbitrator "definitively determined that [the manufacturer] was required to pay [the agent] commissions on sales that occurred dur-

ing" a specific part of the contract period. *Flender,* 953 F.2d at 280. The court found that the manufacturer knew that the agent was seeking commissions in the arbitration, but failed to present the information necessary to permit the arbitrator to state an amount. *Id.* (citing *Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.,* 868 F.2d 52, 58 (3d Cir. 1989)(where arbitrators not asked to quantify amount owing, arbitration award not ambiguous)). The court noted that because the sales agency contract was still in effect, the arbitrator could not calculate the entire amount of commissions that would become due. *Id.* at 280 n. 11. The court found that the arbitrator had resolved all claims before him and left the district court "only the ministerial computation of the amount owed to [the agent]." *Id.* at 280. The court held that "[b]ecause this computation was easily ascertainable from the documents that the arbitrator required [the manufacturer] to produce, the arbitrator's award was final and definite." *Id.*

In *Gerling,* the arbitrator's award also failed to quantify the money owed. One party requested the court to remand to the panel for clarification. 1999 WL 553767 at * 1. The award ordered payment of certain expenses that were set out in a billing statement. However, the award also stated that certain claims could be reduced if three stated conditions were met. The court found that the language of the provision was unambiguous, refused to remand, and ordered the parties to calculate the amount owed. The court stated that "[s]imply because the award does not quantify the money owed to a party does not necessarily mean that it is ambiguous or that a remand is warranted." *Id.* at * 2 (citations omitted).

In *Gerling,* the court distinguished *Seton Co. v. Lohman GmbH & Co.,* 1992 WL

80637 (S.D.N.Y.1992), in which the award provided a four-step formula for the parties to use in calculating the amount of damages due. In *Seton,* the arbitrators had not determined the amount of damages, but instead specified a four-step formula for the parties to follow in making the damages calculations, including both preaward and postaward damages. Both parties asserted that the panel's award was unambiguous and definite, but each presented a vastly different calculation of damages to the court.[26] The court held that neither of the parties was clearly incorrect as to what the arbitrators may have intended and that remand was required for the arbitrators to clarify the award. *Gerling,* 1999 WL 553767 at * 6. The court stated that "[i]ndefinite, incomplete, or ambiguous awards are remanded 'so that the court will know exactly what it is being asked to enforce.'" *Id.* at *5 (quoting *Am. Ins. Co. v. Seagull Compania Naviera, S.A.,* 774 F.2d 64, 67 (2d Cir.1985)).

The portion of the panel's award that sets out two formulas to be used to calculate amounts of IGV taxes that LGA might owe Aguaytia in the future is similar in relevant respects to the cases in which such awards are held ambiguous or indefinite. The panel's formula as to the payment of IGV taxes for attorney and consulting fees and expenses does not resolve the parties' dispute about which items would result in IGV tax obligations, which payments would result in credits toward future obligations, how to value those credits, or how to measure the "loss of time value" when Aguaytia offset IGV tax liability against its existing bank of credits. The panel's formula as to the payment of IGV taxes for remedial work to be invoiced

or performed in the future does not resolve the parties' anticipated disputes as to whether the tax obligation was appropriately applied against Aguaytia's tax "credits."

■ Aguaytia correctly points out that the panel had no other means of, or ability for, providing greater specificity in awarding reimbursement of tax liability not yet incurred. While this limit explains what the arbitrators did, it does not allow this aspect of the award to stand. If an arbitrator is able to specify a formula for amounts of future damages that settles the dispute between the parties and does not leave questions unresolved for further litigation, courts will uphold the award. If an arbitrator's award not only fails to state a sum certain, but also provides a formula that leaves disputes and is likely to require further proceedings, the courts vacate those portions of the award and remand. *See, e.g., Bell Aerospace Co. Div. of Textron, Inc. v. Local 516, et. al,* 500 F.2d 921, 923–24 (2d Cir.1974)(remanding due to ambiguity as to which union was to perform particular task); *Coopertex,* 1990 WL 6548 at *4 (portion of award ordering payment of "warehousing and shipping costs" without specifying amount of costs was not definite); *Star Lines,* 454 F.Supp. at 373–74 (panel erred by entering quantified award only as to part of claim and as to rest merely ordered party to "pay over … such other freight monies as are or may come into its possession" because "a declaration of liability which leaves the question of the amount of money owing unanswered and the possibility of further disputes between the parties open" is an "insufficient and unconfirmable resolution of the freight monies dispute"); *Cofinco,* 395 F.Supp. at

---

**26.** One of the items at issue within the calculations was whether the panel intended the damages to include or exclude a fourteen percent value added tax. The parties present-

ed affidavits of tax experts and economists to the court for review. *Seton,* 1992 WL 80637 at *6.

615 (arbitrators erred by leaving "open matters like 'accrued expenses,' interest, and the like, which could entail large sums and disagreements confided to the arbitral jurisdiction"); *see also Fischer v. CGA Computer Assocs., Inc.*, 612 F.Supp. 1038, 1041 (S.D.N.Y.1985)("construing ambiguous provisions of an arbitration award is the proper province of the arbitrator, not the courts").

▆▆▆ One permissible approach when determining the final amount of damages is not possible is for the arbitrator to award damages for the amounts that are already owing and due but to expressly decline to enter any award as to the amounts that cannot be determined, such as future damages, leaving the parties to resolve that issue in a separate arbitration. *See Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F.Supp. 1, 12 (S.D.N.Y.), *aff'd*, (2d Cir.1973). In *Solitron*, the arbitrators awarded damages under the contract only up to a particular date, stating that they could not determine the damages after that date. The award was challenged as not final and definite. The court upheld the award, stating:

> In the case at bar, the award specifies precisely what [the party] is to pay. Nothing more remains to be calculated at this time. That at some time in the future another arbitration and another award are *possibilities* does not mean that the present award at the present time is not "final" and "definite."

356 F.Supp. 1 at 12.

In the present case, the panel did not decline to enter an award as to the indeterminable amounts. Instead, the panel attempted to prescribe a procedure for the parties to follow in determining, themselves, what amounts were owed. During the arbitration, the parties had vigorously disputed many issues relevant to such a determination. The parties had disputed the amount of IGV taxes that Aguaytia would have to pay for legal fees and for repair work to be invoiced in the future. The formulas provided in the Final Award do not fully resolve the disputed issues necessary to permit the parties to calculate definite amounts of future IGV tax liability.[27]

As in *Seton*, the case distinguished by the *Gerling* court, the panel's description of the process for the parties to follow in computing future damages payable under the award was incomplete. The panel did not leave the parties with a formula that required only "ministerial computation," using information "easily ascertainable from the documents." *Flender*, 953 F.2d at 280. The ultimate question is whether the arbitration panel rendered a decision that settled the disputed issues. With respect to the panel's award of IGV taxes related to fees and expenses for legal services and the panel's award of IGV taxes for work not yet invoiced, and to a large extent not performed, to cure LGA's defective performance, the panel did not resolve the disputes between the parties, as necessary for a final and definite award.

This court DENIES LGA's motion to vacate the portion of the award that provides for reimbursement of IGV taxes Aguaytia paid LGA for pipe that was not installed or purchased; DENIES LGA's motion to vacate the panel's finding that

---

**27.** Unlike the opposing party in *Flender*, LGA is not alleged to have withheld information necessary for the panel to calculate the IGV taxes due. Also unlike the parties in *Flender,* the parties in this case did submit the specific issue of what amount of IGV taxes were owed by LGA to Aguaytia. Unlike *Gerling,* where the award set a sum certain owed but provided a formula for reducing that amount, the panel in the present case did not calculate the amount that LGA owed to Aguaytia, but instead left resolution of that entire issue to the parties.

LGA was obligated to reimburse Aguaytia for IGV taxes it had paid or would pay and for which it would not receive a corresponding credit; and GRANTS LGA's motion to vacate the portion of the award that prescribes a method for determining the amount of IGV taxes LGA owed to Aguaytia relating to remedial work to cure LGA's defective performance and to attorney fees and expenses, as not final and definite. The aspect of the award prescribing a method for the parties to calculate the IGV taxes is vacated and remanded to the International Chamber of Commerce for clarification.

## IX. The Award of Attorney Fees and Costs

The panel awarded attorney fees to Aguaytia in the amount of $2,691,088.00, which LGA argues was in manifest disregard of New York law that forbids an award of excessive attorney fees. (Docket Entry No. 36, p. 29). LGA also argues that the panel acted in manifest disregard of New York law by awarding $525,000 in arbitration costs to Aguaytia. (*Id.*). Aguaytia argues that the contract expressly authorized the arbitrators to award attorney fees and costs and that neither award was excessive.

Section 24.02 of the Agreement, which was expressly incorporated into the parties' Terms of Reference, provides that: The arbitrators shall determine who is the prevailing party and shall award attorney fees and pre-award and post-award interest at commercial rates to the prevailing party, but the arbitrators shall have no authority to award punitive damages under any circumstances (provided, however, the requirement of payment of liquidated damages under the terms of this Agreement shall not be construed as punitive damages) regardless of whether such damages may be available under the law of the State of New York .... Fees and expenses asso-

ciated with arbitration (including the cost of such arbitration) under this Section 24.02 will be paid by each party unless otherwise determined by the arbitrators. Fees and expenses associated with the enforcement of arbitral awards shall be paid by the party against whom that enforcement is sought.

(Docket Entry No. 21, Ex. 5, pp. 2–3).

### A. Attorney Fees

██ The panel determined that Aguaytia was the "prevailing party" under Section 24.02. (Docket Entry No. 36, Ex. B, p. 38). The panel reviewed Aguaytia's application for attorney fees, with the supporting documentation, and ruled on LGA's objections. (*Id.*, p. 39). The panel acknowledged that the amount awarded was "substantial," but found it appropriate. (*Id.*).

LGA cites *Davis v. Prudential § .*, 59 F.3d 1186 (11th Cir.1995), in which the court held that an arbitration panel exceeded its authority under 9 U.S.C. § 10(a)(4) by awarding attorney fees. In that case, however, neither party had submitted the issue of attorney fees to the panel or had presented evidence or argument on the issue of attorney fees. By contrast, in the present case, the panel acted under the express authority granted to it in Section 24.02 of the Agreement and received evidence and argument on attorney fees from both parties. Other cases LGA cites are similarly inapposite in that they address an arbitrator's authority to award attorney fees in the absence of a provision for fees in the parties' agreement.

LGA argues that if the award had included the $5.2 million in stipulated credits, then Aguaytia would not have prevailed to as great a degree. In *Davis*, the Eleventh Circuit stated that "[t]he prevailing party inquiry does not turn on the

magnitude of the relief obtained. Rather, the degree of success obtained by the plaintiff goes to the reasonableness of the amount of the award." 59 F.3d at 1195 (citing *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992))(internal citation omitted). The stipulation presents no basis for vacating the panel's determination that Aguaytia was the prevailing party as to the issues submitted to, and resolved by, the arbitration panel.

New York law on attorney fees does not preclude the award in the present case. In *Krear & Co. v. Nineteen Named Trustees*, the Second Circuit stated that "[a]s a general matter of New York law, ... when a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable." 810 F.2d 1250, 1263 (2d Cir.1987). "As stated by the New York Court of Appeals in *Equitable Lumber Corp. v. IPA Land Development Corp.*, 38 N.Y.2d 516, 381 N.Y.S.2d 459, 344 N.E.2d 391, 397 (1976), '[w]hile plaintiff may enter into any fee arrangement it wishes with counsel, it should not be permitted to manipulate the actual damage incurred by burdening the defendant with an exorbitant fee arrangement.' " *Id.* Factors for assessing the reasonableness of an award of attorney fees include: "the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation;

the customary fee charged by the Bar for similar services; and the amount involved." *Id.* (citation omitted).

In the present case, the complexity of the subject matter and the issues, the protracted nature of the proceedings, the skill of the lawyers involved, and the amounts at issue and awarded, all support a significant fee award. LGA has not asserted that Aguaytia's counsel lacked the skill or experience reflected in the award, performed unnecessary work, or charged a fee exceeding the customary fee charged for such work. LGA has presented no basis for holding that the panel acted in manifest disregard of New York law or of its obligations under the parties' Agreement with respect to the fee award. This court DENIES LGA's motion to vacate the award of attorney fees based on manifest disregard of New York law.

## B. Costs

LGA also argues that the panel acted in manifest disregard of New York law and contrary to the essence of the parties' Agreement by awarding $525,000 in arbitration costs to Aguaytia. LGA asserts that New York law strictly limits costs and that Aguaytia should not have recovered any more than $3,300. (Docket Entry No. 36, p. 30). LGA cites to two New York statutes governing the award of costs.[28] Aguaytia argues that these statutes do not apply to the present arbitration.

The panel considered LGA's argument that procedural rules under the New York

---

**28.** Section 8201 of the N.Y.C.P.L.R., entitled "Amount of Costs in an Action," states that "Costs awarded in an action shall be in the amount of: (1) two hundred dollars for all proceedings before a note of issue is filed; plus (2) two hundred dollars for all proceedings after a note of issue is filed and before trial; plus (3) three hundred dollars for each trial, inquest or assessment of damages."

Section 8303 of the N.Y.C.P.L.R. permits a discretionary award of costs, "2. to any party to a difficult or extraordinary case, where a defense has been interposed, a sum not exceeding five percent of the sum recovered or claimed, or of the value of the subject matter involved, and not exceeding the sum of three thousand dollars." (Docket Entry No. 36, p. 30).

Civil Practice Law and Rules applied to limit the amount of costs that could be awarded. The panel rejected the argument, stating that "New York court procedural rules are not controlling in these proceedings." (Docket Entry No. 36, Ex. B, p. 39). The Terms of Reference stated:

*Applicable Procedural Rules:* The rules governing these arbitration proceedings shall by agreement of the parties be the ICC Rules of Arbitration in force as from January 1, 1998 and such other mandatory rules under the laws of New York applicable to an international commercial arbitration; and where these rules are silent, such other rules as may be agreed in writing by the parties or, in the absence of such agreement, as may be determined by the Tribunal.

(Docket Entry No. 21, Ex. 5, p. 26).[29]

LGA relies on *Kessler v. Hunter*, 30 A.D.2d 573, 291 N.Y.S.2d 268 (N.Y.App. Div.1968) to show that the New York procedural rules limitations on costs apply to the present arbitration. *Kessler* involved litigation, not arbitration. LGA has failed to show that the cited statutes applied.

LGA also cites to section 7513 of the N.Y.C.P.L.R.,which provides:

Unless otherwise provided in the agreement to arbitrate, the arbitrators' expenses and fees, together with other expenses, not including attorney's fees,

incurred in the conduct of the arbitration, shall be paid as provided in the award. The court, on application, may reduce or disallow any fee or expense it finds excessive or allocate it as justice requires.

LGA has not shown that the panel acted contrary to section 7513, assuming, without deciding, that it applied. *See Spector v. Torenberg*, 852 F.Supp. 201, 210 (S.D.N.Y.1994)(characterizing section 7513 as a procedural rule that applies only to arbitrations that take place in New York). Aguaytia requested $1,549,461.00 in costs and expenses. The panel stated that it had "reviewed those costs and expenses mindful of the preference articulated in Section 24.02 and LGA's challenge to the reasonableness of those costs and expenses." (Docket Entry No. 36, p. 39). The panel stated that "[b]ased upon our review of the record and our familiarity with the issues contested in these proceedings, it is our view that LGA has injected issues into these proceedings that unnecessarily resulted in the impositions of costs and expenses on [Aguaytia]." (*Id.*). The panel concluded that Aguaytia should be awarded $525,000 as reimbursement for costs and expenses for issues that LGA unnecessarily injected into the proceedings. The panel ordered that all other costs and expenses were to be borne by

---

**29.** Article 15 of the ICC Rules of Arbitration, states:

Rules Governing the Proceedings
(1) The proceedings before the Arbitral Tribunal shall be governed by these Rules, and, where these Rules are silent by any rules which the parties or, failing them, the Arbitral Tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration.
(2) In all cases, the Arbitral Tribunal shall act fairly and impartially and ensure that each party has a reasonable opportunity to present its case.

Article 17 of the ICC Rules of Arbitration states:
Applicable Rules of Law
(1) The parties shall be free to agree upon the rules of law to be applied by the Arbitral Tribunal to the merits of the dispute. In the absence of any such agreement, the Arbitral Tribunal shall apply the rules of law which it determines to be appropriate.
(2) In all cases the Arbitral Tribunal shall take account of the provisions of the contract and the relevant trade usages.
(3) The Arbitral Tribunal shall assume the powers of an *amiable compositeur* or decide *ex aequo et bono* only if the parties have agreed to give it such powers.

the parties "as assessed and/or incurred," consistent with Section 24.02 of the Agreement.

Section 24.02 of the Agreement stated that each party would bear its own costs incurred in the arbitration, unless "otherwise determined by the arbitrators." The Agreement allowed the arbitrators to award the costs of the arbitration as part of the award, while stating a preference that each party would bear its own costs. The panel explained the basis on which it awarded part of the costs to LGA. LGA asserts that the award of costs was "punitive," in violation of the provision in the Agreement precluding any award of punitive damages. In *Synergy Gas Co. v. Sasso*, 853 F.2d 59 (2d Cir.1988), the Second Circuit rejected a similar argument. In *Sasso*, the arbitrators awarded attorney fees to "attempt to make the [prevailing party] whole for the costs it had expended." *Id.* at 66. However, the arbitrator also had found that the other party acted in bad faith, prompting that party to argue that the award must have been "punitive" in nature. The court stated that the award was compensatory, not punitive. *Id.* (citing *In re South East Atlantic Shipping, Ltd. v. Garnac Grain Co.*, 356 F.2d 189, 192 (2d Cir.1966)(stating that even where arbitrator expressed moral outrage, award should not be presumed punitive)). LGA has not shown that the award was punitive, as opposed to compensatory.

LGA presents no specific basis that would warrant this reviewing court, given the record reviewed and the limits of judicial review, to displace the arbitration panel's conclusion that an award of $525,000.00 in costs was warranted. Even assuming, without deciding, that N.Y.C.P.L.R. § 7513 applies to the arbitration proceeding, LGA has not identified, nor does this court find, a basis to modify or disallow the panel's award of fees or costs.

This court DENIES LGA's motion to vacate or modify the award of costs and expenses.

## C. Attorney Fees and Costs for this Litigation

In the proposed form of final judgment, Aguaytia requested not only the attorney fees and costs awarded by the arbitration panel but also attorney fees and costs associated with the present litigation to confirm the award and to respond to LGA's motion to vacate the award, along with IGV taxes that may accompany the attorneys' services. LGA opposes this request.

In the absence of statutory authorization or an agreement between the parties, the "American rule" is that each party to litigation in federal court pays their own attorney fees. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 245–47, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Galveston County Navigation Dist. No. 1 v. Hopson Towing Co.*, 92 F.3d 353, 356 (5th Cir.1996). "The FAA does not provide for attorney's fees to a party who is successful in confirming an arbitration award in federal court." *Trans Chemical Ltd. and China Nat'l Mach. Import & Export Corp.*, 978 F.Supp. 266, 311 (S.D.Tex.1997)(citing *Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir.1994)). "The prevailing party may nevertheless be entitled to attorney's fees in an action to confirm an arbitration award if the opponent's reasons for challenging the award are 'without merit' or 'without justification,' or are legally frivolous, that is, brought in bad faith to harass rather than to win." *Id.* (citing *Executone Info. Sys. v. Davis*, 26 F.3d 1314, 1331 (5th Cir.1994))(other citations omitted). In *Trans Chemical*, the court held that the same, strict standard applied to awards for attorney fees under the New York Convention, noting that the Convention dis-

courages imposing costs that could have a "chilling effect" on the arbitration process. *Id.* (citing *Skandia Am. Reins. Corp. v. Seguros Law Republica,* 1996 WL 622559, *8 (S.D.N.Y. Sept.20, 1996)). The court concluded that "[a] confirming court therefore should not award attorney's fees except in the most extraordinary of circumstances." *Id.* at 311–12.

Section 24.02 of the Agreement and the parties' Terms of Reference states that "[f]ees and expenses associated with the enforcement of arbitral awards shall be paid by the party against whom that enforcement is sought." (Docket Entry No. 21, Ex. 5, p. 3). LGA argues that this provision does not include attorney fees. In support, LGA notes that Section 24.02 treats "attorney fees" as separate from "fees and expenses." (Docket Entry No. 49, p. 21). Section 24.02 states that "[t]he arbitrators shall determine who is the prevailing party and shall award attorney fees." Section 24.02 also states that "[f]ees and expenses associated with arbitration (including the cost of such arbitration) under this Section 24.02 will be paid by each party unless otherwise determined by the arbitrators." LGA has presented a convincing argument that the language of Section 24.02 suggests that the phrase "fees and expenses" does not include attorney fees. Aguaytia has not responded to this argument.

Instead, Aguaytia argues that an award of attorney fees is appropriate because LGA opposed enforcement of the award "without justification." (Docket Entry No. 54, p. 5). Aguaytia states that "LGA's bad faith throughout the arbitration was confirmed by the Tribunal's finding that LGA had needlessly run up Aguaytia's costs by presenting claims and arguments that

LGA knew to be invalid . . . ." (*Id.*). "LGA has continued with these tactics, urging on the Court approximately 30 claimed deficiencies in the Tribunal's award, which LGA certainly knew could never be justified under the standards for review of arbitral awards." (*Id.*). Aguaytia notes that "[i]ndeed, LGA appears to have abandoned about one-third of these claims" before this court's ruling.[30] Aguaytia also asserts that:

> Moreover, the vast majority of LGA's claims would require the Court, contrary to well-established authority, to: (i) review in detail the arbitration record and reach contract and fact determinations different from those of the Tribunal and (ii) find that the Panel (which included an LGA expert on New York law) knowingly disregarded New York law, even though LGA has not pointed to any applicable New York law with which the Tribunal's award is inconsistent.

(Docket Entry No. 54, pp. 5–6). Aguaytia also attacks LGA's claims of arbitrator bias as "lacking in any legal or factual support" and "for the most part waived because of LGA's intentional delay in presenting them and, in any event, were rejected by the ICC over a year ago." (*Id.,* p. 6). Aguaytia asserts that "LGA simply does not want to pay and is misusing the FAA to postpone the day of reckoning." (*Id.*).

Courts award attorney fees incurred in actions to enforce arbitration awards in very narrow circumstances. In *Bruce Hardwood Floors v. UBC, So. Council of Indus. Workers, et. al,* 103 F.3d 449 (5th Cir.1997), the district court had confirmed an arbitration award and awarded attorney fees, finding that the opposing party acted "without justification." The Fifth Circuit

---

**30.** Aguaytia notes that the number of grounds LGA asserted decreased between LGA's Brief in Support of Plaintiff's Petition to Vacate, Modify or Amend (Docket Entry No. 25), filed on April 18, 2001; LGA's Supplemental Brief (Docket Entry No. 36), filed on June 21, 2001; and LGA's Summary Chart (Docket Entry No. 51), filed on October 18, 2001.

reversed both holdings on appeal. In that case, the Fifth Circuit concluded that the arbitrator had exceeded his authority and the award should not have been confirmed and that the district court abused its discretion in awarding attorney fees. *Id.* at 453; *see also Amalgamated Meat Cutters & Butcher Workmen of N. Am. v. Great Western Food Co.*, 712 F.2d 122, 125 (5th Cir.1983)(same). However, in *Int'l Assoc. of Mach. & Aerospace Workers v. Texas Steel Co.*, 639 F.2d 279 (5th Cir.1981), the Fifth Circuit held that a district court abused its discretion in *not* awarding attorney fees. In *Texas Steel,* the court stated that "when determining whether a party's refusal to abide by an arbitration decision was 'without justification' such as to authorize an award of attorneys' fees to the party seeking enforcement, it is of course not enough merely to conclude that because the challenge was unsuccessful, it therefore was 'without justification.'" *Id.* at 283. "By parity of reasoning, however, the mere assertion that the grounds for a party's refusal to abide by the award concerned the arbitrator's power to make the award does not compel the conclusion that the party's decision must have been justified." *Id.* The challenge to the award in that case "addressed not the arbitrator's jurisdiction, but rather the panel's action on a matter involving the 'intrinsic merits' of the dispute, i.e., the panel's interpretation of the grievance and its broad discretion in fashioning an appropriate remedy." *Id.* at 284. The court stated that "these grounds for attacking an arbitration award, no matter how characterized, are without merit, and a refusal to abide by a decision based upon such grounds is 'without justification.'" *Id.*

Aguaytia has argued that many of LGA's bases for attacking the award were similarly attacks on the "merits" of the arbitrator's decision and were impermissible as a matter of law. This court notes that LGA has not challenged every aspect of the award. To the contrary, as Aguaytia points out, LGA was selective in its challenges to the award. This court has found that one of LGA's challenges, to the provision awarding IGV taxes, had merit; this court has vacated and remanded that portion of the award. Other challenges, based on arbitrator bias and the need for discovery, required a thorough analysis of the facts and the relevant law. Although this court found no support for LGA's argument that the panel's refusal to incorporate the parties' stipulation provided a basis for vacating the entire award, this court did agree that on the present record, it was appropriate for the arbitrators, not this court, to determine the impact of the stipulation on the final amount owing between the parties.

The standard for disregarding the American rule that parties should bear their own attorney fees, in the absence of a statutory provision or an agreement to the contrary, is high. Although some of LGA's challenges had a low likelihood of success, Aguaytia has not shown that LGA presented those challenges in bad faith. Aguaytia alleged that LGA presented its challenges only to delay paying what it owed, but has not presented facts supporting this sweeping allegation. This court DENIES Aguaytia's request for an award of attorney fees incurred in bringing this action to enforce the arbitration award.

## X. Request for Bond

■ Aguaytia has requested this court to order LGA to post a bond for $9,100,000, the approximate amount of money, in principal and interest, that LGA owed as of December 31, 2001.[31] (Docket Entry No. 45, p. 5). Aguaytia asserts that

---

**31.** Aguaytia's calculation of this amount included its proposed "offset" of the credits covered by the stipulation. This court has denied Aguaytia's request to "offset" the

"in light of LGA's efforts to have the awards vacated," this court should order the bond as "appropriate guaranties" or "suitable security," under Article 6 of the Inter–American Convention [32] and Article VI of the New York Convention,[33] respectively. (*Id.*). LGA disputes that this court has authority to order a bond and argues that no bond is necessary. (Docket Entry No. 50).

LGA argues that Article 6 of the Inter–American Convention and Article VI of the New York Convention apply only if there are "separate, distinct and parallel proceedings in a different country seeking to vacate the award." (Docket Entry No. 50, pp. 5–6). Aguaytia argues that Article VI of the New York Convention is not so limited. *See, e.g., Skandia Am. Reinsurance Corp. v. Caja Nacional de Ahorro y Segoro,* 1997 WL 278054 (S.D.N.Y. May 23, 1997); *Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro,* 2001 WL 322005 (N.D.Ill. Apr.2, 2001). The cases Aguaytia cites examined whether Article VI of the New York Convention prohibited a court from imposing on a foreign insurer the state law requirement that an insurer post security. This court is not presented with such a state law requirement. The argument Aguaytia presents to this court is that the arbitration history of this case and the "equities" support a bond requirement. (Docket Entry No. 55).

Aguaytia asserts that LGA was formed as a single purpose company and is not a going concern with assets sufficient to satisfy the award. (*Id.,* p. 2). Section 2.10 of the Agreement provides the following:

> *Parent Guaranty.* On the Contract Date, Contractor shall cause Parent Company to provide Company a guaranty in the form of *Schedule 2.10* guaranteeing all of Contractor's obligations under this Agreement (the *"Parent Guaranty"*). Not later than ten (10) days after the end of the Defects Period, Company shall return to Contractor such Parent Guaranty.

(LGA Ex. 2). LGA asserts that the Parent Guarantee from ABB Norway provides any necessary and "appropriate guaranties." (Docket Entry No. 50, pp. 2–3). Aguaytia responds that the Agreement did not limit Aguaytia to this guaranty, but does not show why this guaranty is inadequate. (Docket Entry No. 55, p. 2).

This court finds that the present record is insufficient to show the need or justification for a bond as an additional guaranty of payment. This court DENIES Aguaytia's request for posting of a bond.

## XI. Conclusion

Based on the pleadings, the motions and responses, the evidence presented, the ar-

---

award in this manner, as outside this court's limited authority in this proceeding to confirm the award.

**32.** The Inter–American Convention provides:
> If the competent authority mentioned in Article 5.1.e has been requested to annul or suspend the arbitral decision, the authority before which such decision is invoked may, if it deems it appropriate, postpone a decision on the execution of the arbitral decision and, at the request of the party requesting execution, may also instruct the other party to provide appropriate guaranties.

9 U.S.C. § 301, Art. 6.

**33.** The New York Convention provides:
> If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

9 U.S.C. § 201, Art. VI.

guments of counsel, and the applicable law, this court DENIES LGA's motion for discovery on the issue of evident partiality or bias; DENIES LGA's motion to vacate the award in its entirety; DENIES LGA's supplemental petition and motion to vacate the award in its entirety; GRANTS, in part, LGA's supplemental petition and motion to vacate, as to the provision of the award prescribing a method for Aguaytia to obtain payment for certain IGV taxes; GRANTS Aguaytia's motion to confirm and enforce the arbitration awards, except as to the provision prescribing a method for Aguaytia to obtain payment for certain IGV taxes and except as to Aguaytia's request to offset the amount of the final award by the stipulated credits; DENIES Aguaytia's request for attorney fees incurred in bringing this action to confirm the award and to respond to LGA's challenges to the award; and DENIES Aguaytia's request for posting of bond.

In sum, this court confirms the arbitration award, except for the provision describing a process for Aguaytia to obtain certain categories of IGV taxes LGA owes to Aguaytia. This court vacates and remands the aspect of the award that describes the process for the parties to determine the amount of IGV taxes LGA owes to Aguaytia. This court confirms, and does not remand, the award insofar as it finds that Aguaytia is entitled to obtain reimbursement of those IGV taxes that it has paid or will pay and that were definitely determined. This court remands for further clarification or determination by an arbitration panel only the determination of the amounts LGA owes Aguaytia in IGV taxes. This court also remands for clarification the impact of the parties' stipulation on the final award. This court confirms the remaining aspects of the award.

This court also ORDERS the parties to appear for a status conference on April 12, 2002, at 9:00 a.m., to discuss the most efficient method of proceeding, in light of these rulings.

## MEMORANDUM AND ORDER ON MOTION FOR RE-CONSIDERATION

After a lengthy arbitration process that resulted in an award resolving the disputed claims and counterclaims between Lummus Global Amazonas, S.A. ("LGA"), the project contractor, and Aguaytia Energy Del Peru S.R. Ltda. ("Aguaytia"), the project owner, LGA brought this lawsuit to vacate, modify, or amend the arbitration award. Aguaytia moved to confirm and enforce the arbitration award and for entry of judgment. After analyzing the numerous challenges LGA raised, this court entered a Memorandum and Order confirming the arbitration award except as to two discrete issues. This court vacated the portion of the award addressing LGA's liability for certain IGV taxes and remanded that issue to the International Chamber of Commerce ("ICC") for further arbitration. Since then, Aguaytia has voluntarily withdrawn its claim for IGV taxes. (Docket Entry No. 62). This court also remanded to the ICC the discrete and narrow issue of the effect of the parties' Stipulation that Aguaytia owed LGA $5.2 million in credits. The parties now seek reconsideration as to this one remaining issue. Through the motion for reconsideration and the response, the parties ask this court to reexamine the status of the Stipulation they reached during the arbitration, but which the arbitration panel did not incorporate into the Final Award.

LGA urges this court to reconsider its earlier decision not to vacate the entire award. LGA urges that vacating the entire award is required because of the arbitration panel's refusal to incorporate the parties' Stipulation that Aguaytia owed LGA a $5.2 million credit as an offset to

the amount awarded Aguaytia. (Docket Entry No. 60). Aguaytia vigorously disputes that vacatur is necessary or appropriate. Aguaytia has moved for entry of final judgment, either in the full amount of the arbitration award, $13,197,284.00, plus interest, or in the net amount of $7,821,539.00, plus interest. The second amount incorporates the parties' Stipulation as a setoff to the arbitration panel's award. Aguaytia, in effect, asks this court to reconsider its earlier refusal to correct or modify the panel award rather than order a limited remand to the ICC. (Docket Entry Nos. 62, 71).

Both LGA and Aguaytia have supplemented the record to clarify the relationship of the parties' Stipulation to the arbitrators' Final Award. This court has carefully reviewed the supplemented record, the motions for reconsideration, the responses, the argument of counsel, and the applicable law. Based on that review, this court modifies section VII of its earlier opinion. This court again concludes that vacatur is not required and denies LGA's motion for reconsideration seeking that relief. However, the supplemented record leads this court to conclude that it does have a sufficient basis to enter judgment that incorporates the parties' Stipulation with the Final Award. The result is a judgment that gives effect to the arbitrators' Final Award and to the parties' Stipulation.

This court DENIES LGA's motion to reconsider and again rejects the argument that vacatur is the only and mandatory remedy. This court GRANTS, in part, and DENIES, in part, Aguaytia's motion for entry of final judgment. The reasons for these rulings are set out below.

## I. LGA's Motion for Reconsideration and the Supplemented Record

LGA has moved for reconsideration only of the part of this court's March 26, 2002 Memorandum and Order addressing the panel's failure to incorporate the stipulated credits in the Final Award. LGA asserts that the supplemented record should lead this court to conclude that the panel erred in refusing to incorporate in the Final Award the parties' Stipulation as to the amount due LGA, and that vacatur is the only remedy. LGA has submitted a revised timeline of the evidence submitted during the arbitration process. That timeline, with the supporting documentation, clarifies the relationship of the Stipulation to the arbitrators' award, but does not lead this court to find that vacatur is required or appropriate.

The parties agree that the Terms of Reference the parties and arbitrators signed included LGA's claim for $2.2 million in unpaid invoices and IGV taxes and damages of $3.1 million for Aguaytia's draw down of the letter of credit. LGA asserts that the Terms of Reference requested the panel to enter awards for the items covered by the parties' Stipulation:

# 14. Claim: Claimant [LGA] is entitled to $2,202,314 plus IGV taxes for outstanding and past due invoices.

Requested Relief: Payment of Claimant's outstanding and past due invoices in the amount of $2,202,314 plus IGV taxes.

# 17. Claim: Claimant is entitled to damages of $3,100,000 plus interest, banking charges and fees resulting from Respondent's arbitrary draw down under the Citibank N.A. Letter of Credit. Requested Relief: Damages in the amount of $3,100,000 plus interest, banking charges and fees resulting from the arbitrary draw down under the Citibank N.A. Letter of Credit.

(Docket Entry No. 21, Ex. 5).

During the arbitration, LGA argued that Aguaytia's draw down of the letter of credit was arbitrary because LGA did not owe

Aguaytia the liquidated damages that Aguaytia claimed. The panel held that LGA did owe Aguaytia $6.8 million in liquidated damages, which Aguaytia characterizes as an implicit holding that the draw down was not arbitrary. On its face, claim seventeen asks for damages for an "arbitrary draw down," not to include the amount drawn down as an offset if the panel determined that LGA was liable for liquidated damages.

On September 1, 2000, the arbitrators signed a procedural order stating that these claims would be resolved in Phase II of the proceedings. On December 11, 2000, the parties entered their Stipulation as Exhibit H–1 before the arbitrators. In the discussion with the panel on the Stipulation, the lawyers told the panel that "one of the more troublesome areas in the IGV area has been resolved." (Docket Entry No. 61, Ex. 7, p. 12). The lawyers explained that they had resolved LGA's claim under section 11.02(c); the claim for $400,000 for an outside accounting firm; and the claim as to certain invoices. The lawyers explained and emphasized that "what the stipulation does is to remove from the case" the specific subjects covered in the stipulation. (*Id.* at 14). The exchange included the following:

> MR. DAVIS: ... What this stipulation does is to remove from the case our request for an accounting, our request for specific performance related to Section 11.02(c), although -
>
> MR. OVERCASH: For just the invoices identified?
>
> MR. DAVIS: Well, no, not actually, that's a little confusing.... [W]e said if you give us this factura which covers almost all of the IGV claims that have been made except for two hundred some odd thousand dollars, we, Aguaytia, will withdraw our Section 11.02(c) claim.... So this is ... a settlement of

convenience to take this outside the case.

> MR. DAVIS: I think this will greatly simplify the issues. I mean, you can focus on the three invoices. All the testimony about the accounting claims and all—I mean, how we want the money to have somebody go in and look at their records, that's all removed from the case. We just—rather than get a 100 percent resolution of the 11.02(c) issue, we have gotten .. a 97 percent resolution of it, and we're willing to push that issue outside the case. So you all don't need to worry about that. The stipulation sets out an agreement between the parties.

(*Id.* at 14–16). On December 15, 2001, Tony Hines, who was responsible for Aguaytia's accounting during the project, testified that LGA was entitled to $3.1 million in credit for the letter of credit Aguaytia had drawn down on September 14, 1998. (Docket Entry No. 40, Ex. 60, vol. 5, p. 967–68). Hines testified that the $3.1 million should be used as an offset to any amount awarded Aguaytia. Aguaytia does not dispute this testimony.

On January 22, 2001, the parties submitted to the panel Exhibit H–62, a project account balance which "presented the position of both parties either when you agree or when you disagree over the amount involved in particular issues and the timing of those issues for the running of interest." (Docket Entry No. 61, Ex. 11, p. 3). When the parties submitted Exhibit H–62, the chairman of the panel stated: "[T]his will be a very important document. I want to be exactly sure what the parties agree on and what they disagree on. Obviously we'll decide what they disagree on." (Docket Entry No. 44, Ex. 40, p. 1161, ll. 15–18). LGA did not object to this characterization of Exhibit H–62.

The panel issued its Final Award on April 23, 2001. In footnote 2 and footnote 8, the panel made it clear that the Final Award did not "include a complete definition of the final amount of funds payable from one party to the other since that involves issues not determined in this proceeding" and did not include "the amount of the invoices to which the parties agreed in their Stipulation of December 11, 2000." (Docket Entry No. 61, Ex. 14, p. 35, n. 8).

In June 2001, the parties filed a Joint Application for Correction of Final Award, asking the panel "to approve the Stipulation or its substantive provisions as an addendum to the Final Award," under Article 29 of the ICC Rules of Arbitration. (Docket Entry No. 36, Ex. C). In the Joint Application, the parties stated:

A number of issues existed at the commencement of the arbitration which were resolved by the parties through stipulation and agreement. These issues, regarding the amount and due date of various payments, are set out in Phase 2 Exhibits H–1 and H–62 and are listed in a Stipulation of the parties attached hereto. Because the parties require certitude regarding these items in order to determine the final amount due [Aguaytia] and because the Terms of Reference listed several of these items as issues the Tribunal was to resolve, the Stipulation or its substantive provisions should be approved as an addendum to the award. Consideration also should be given to the effect of this addendum on footnotes 2 and 8 of the Final Award.

(*Id.*, Ex. 13). The parties attached the December 2000 Stipulation and a Stipulation signed in May 2001, which set out the parties' agreement to correct the Final Award to reflect the agreements found in Exhibits H–1 and H–62, including specific items, amounts, and payment due dates to calculate the balance due and pre-award and post-award interest.

On September 4, 2001, the panel issued an addendum to the Final Award, denying the parties' Joint Application to correct the award. (Docket Entry No. 52, Ex. 73). The panel stated as follows:

In their Joint Application the parties ask the Tribunal to supplement the Final Award by including in it the contents of a Stipulation executed by the parties in May 2001. As the matters contained in the May 2001 Stipulation were resolved by the parties and not subject to resolution by the Tribunal, there is no proper basis for "correcting" or "interpreting" the Final Award. Accordingly, no revision to the Final Award will be made on the Joint Application.

(*Id.*, p. 2).

The supplemented record the parties have submitted with the briefing on the motion to reconsider and response makes it clear that some of the statements in this court's prior opinion must be corrected. The Terms of Reference did include the claims for the two categories of offset, the $2.2 million in invoices plus IGV taxes and the $3.1 million in the draw down of the letter of credit. The parties did submit the December 2000 Stipulation to the panel before the Final Award issued, with statements making it clear that the stipulated matters were "removed from the case." The parties did present the panel with information as to the items, amounts, and dates of the categories covered by the Stipulations, providing a basis for the panel to calculate the amount due Aguaytia after applying the credit due LGA as an offset. In its motion for reconsideration, LGA urges that given these clarifications as to the evidence and information that was before the panel, this court should find that the panel's refusal to incorporate the

Stipulation in the Final Award was error, that requires vacatur of the entire award.

■ The supplements to the record before this court reinforce the conclusion that the arbitration panel could have incorporated the Stipulation, had it wished to do so. However, the record does not require the conclusion that the panel's decision not to incorporate the Stipulation makes the Final Award fatally indefinite and lacking in finality under 9 U.S.C. § 10(a)(4). The supplemented record amply supports Aguaytia's position that the panel resolved the disputed issues that were before it when the Phase II hearing concluded. The record is also clear that the parties told the panel that the effect of the Stipulation was to remove the matters stipulated from the case. Counsel provided assurances that the arbitrators "don't need to worry" about the stipulated matters. (Docket Entry No. 61, Ex. 7, p. 16). When the parties submitted Exhibit H–62, the chairman of the panel stated: "[T]his will be a very important document. I want to be exactly sure what the parties agree on and what they disagree on. Obviously we'll decide what they disagree on." (Aguaytia Ex. 40, p. 1161, ll. 15–18). In the Addendum to the Final Award, the panel emphasized that because the parties had resolved the matters contained in the May 2001 Stipulation, those matters were "not subject to resolution by the Tribunal."

The parties told the panel that the stipulated matters were no longer part of what the arbitrators needed to decide. The panel told the parties that it would decide the disputed matters, but would not address matters that the parties had resolved between themselves. The parties did not ask the panel to treat the Stipulation as a settlement under Rule 23 of the ICC Rules. The panel did not err in refusing to "correct" its award to include the credits or in declining to treat the parties' Stipulation as a settlement agreement, so as to require vacatur.

"Arbitration is contractual and arbitrators derive their authority from the scope of the contractual agreement." *Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.,* 607 F.2d 649, 651 (5th Cir.1979)(citing *Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. 1358). "Parties to an arbitration may stipulate the issues they want determined and increase or limit the arbitrator's contractual authority by their express submission." *Am. Postal Workers Union v. Runyon,* 185 F.3d 832, 835 (7th Cir.1999)(quoting *Hill v. Staten Island Zoological Soc'y, Inc.,* 147 F.3d 209, 214 (2d Cir.1998)). In this case, the arbitration clause required arbitration of disputes between the parties. Although the Terms of Reference included the two categories of payments later made the subject of the Stipulation, the parties reached agreement as to both categories, outside the arbitration process and before it concluded. In presenting the Stipulation on December 11, 2000, the parties told the panel that the effect of the Stipulation was to remove the items addressed from the case before the panel. It was not until after the Final Award issued that the parties specifically requested the panel to "correct" the award by including the stipulated amounts. The panel addressed the narrow question of whether the ICC rules required it to correct the award. The panel found that under those rules, the panel was not required to "correct" or "interpret" the Final Award to include matters that the parties had resolved by agreement, outside the arbitration process, and had not submitted to the panel for decision.

The panel did not render an indefinite award or an award that lacked finality as to the disputed issues before it. To the contrary, the panel made it clear that it had resolved all the disputed matters,

making a final decision as to those matters. All that remained, according to the panel, was to state "the final amount of funds payable from one party to another." (Docket Entry No. 36, Ex. B. p. 3 n. 2). The parties did not, and do not now, dispute the amounts that would be incorporated into the arbitration award to state the final balance owing from one party to the other. The parties have repeatedly stated that there is no dispute as to the items covered by the Stipulation, the amounts, and the dates on which payment is to be calculated. There is no dispute as to how the amounts established by the Stipulation are to be incorporated into the Final Award to state the balance due. The Final Award is neither indefinite nor lacking in finality as to the disputed matters that the arbitrators decided. There is no basis for vacatur under section 10.

Even if LGA was correct in characterizing the arbitrators' refusal to incorporate the stipulated amounts in the final award as error, vacatur would not be required. The disputed matters as to which the panel entered its award were separate and independent from the matters addressed in the parties' Stipulation. LGA relies on *HMC Mgmt. Corp. v. Carpenters Dist. Council of New Orleans,* 750 F.2d 1302, 1305 (5th Cir.1985) for the proposition that "[t]he relief usually granted when an arbitration award is not enforced is to vacate." In *HMC,* the plaintiff sought arbitration against his former employer, asserting that he had been fired in violation of a collective bargaining agreement. The arbitrator found in favor of the plaintiff. The court held that the arbitrator had exceeded his authority by entering an award that did not "draw its essence" from the collective bargaining agreement. However, the court did not vacate the entire award. The court remanded for further arbitration, stating that vacating the award would "punish" the plaintiff for the arbitrator's failure to perform his

duties. *Id.* at 1305. *HMC* does not support LGA's argument that vacating the entire award is the only proper remedy.

LGA also relies on *Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.,* 607 F.2d 649, 653 (5th Cir.1979). LGA states that "[i]mportantly, the Fifth Circuit did not partially remand the dispute in *Totem* to allow the same arbitration panel an opportunity to reconsider its award." (Docket Entry No. 60, p. 15). However, in *Totem,* one of the grounds on which the court vacated the award was that the panel had received *ex parte* communications and evidence, a defect which affected the entire proceedings. *Totem* does not support LGA's position.

LGA asserts that in *Legion Ins. Co. v. VCW, Inc.,* 198 F.3d 718, 721 (8th Cir. 1999), "the Eighth Circuit specifically rejected the very remedy of partial remand that this Court fashioned." (Docket Entry No. 60, p. 15). In *Legion,* the Eighth Circuit held that the district court erred in vacating, in part, and confirming, in part, the arbitration award. The Eighth Circuit explained that "when a panel by the language it uses makes clear that it intends its award to be indivisible, the district court must take the award as it finds it and either vacate the entire award under section 10 or modify the award using section 11." *Id.* at 721. The court stated that "[m]oreover, in this instance, to vacate only a portion of the award would result in an unintended windfall in favor of [the prevailing party]." *Id.* The panel in this case did not state or otherwise indicate that it intended its award to be indivisible. To the contrary, the panel made it clear that its decision on disputed matters was separate and distinct from the parties' Stipulation. LGA has failed to explain how the stipulated credits issue is indivisible from the issues that the panel did determine. *Legion* is inapposite.

LGA also asserts that Aguaytia and this court improperly relied on *Puerto Rico Maritime Shipping Auth. v. Star Lines Ltd.*, 454 F.Supp. 368 (S.D.N.Y.1978), *disapproved on other grounds, Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411 (2d Cir.1980), to support the remedy of partial remand. In *Star Lines*, the court stated that:

> if an award is valid in part and invalid in part, and the valid portion concerns claims that are "separable" from and "non-dependent" on claims covered by the invalid portion, the valid portion of the award is confirmable, notwithstanding the absence of an award that finally disposes of all the claims that were submitted to arbitration.

*Id.* at 372 (citations omitted). The court held that the panel failed to issue a final award as to the claim for freight monies, by awarding a sum certain as to particular freight monies but awarding "such other freight monies as are or may come into its possession." The court found that the freight monies claim was separable from the rest of the award, but that the two parts of the freight monies award were not separable from each other. *Id.* at 373. The court vacated, in part, and confirmed, in part, remanding the portion of the award addressing the freight monies claim and otherwise confirming the award. *Id.* LGA correctly points out that the Second Circuit subsequently disapproved *Star Lines*. However, the Second Circuit disapproved of the implication in *Star Lines* that a court has jurisdiction to review an interim award that the arbitrators did not intend to be final. *See Michaels*, 624 F.2d at 414 & 415 n. 5. The Second Circuit's disapproval did not extend to whether a court reviewing a final award could remand discrete parts of that award rather than vacate the entire award.

In *Star Lines*, the court referred to *Moyer v. Van–Dye–Way Corp.*, 126 F.2d 339 (3d Cir.1942). In *Moyer*, unlike *Star Lines*, the arbitrator had entered an award that it intended to be final. The award addressed two claims, a wage payment claim and a welfare fund claim. The arbitrator had awarded a sum certain on the wage payment claim but had failed to make a definite award as to the welfare fund claim. The prevailing party sued to enforce the award. The issue on appeal was whether the arbitrator's "failure ... to settle all the questions which he was supposed to determine" precluded enforcement of the award on the claim he did determine. *Id.* at 341. The court found that the wage payment claim was "separable and non-dependent" from the welfare fund claim. The court held that the part of the award addressing the wage payment claim was valid and enforceable, despite infirmities in the part addressing the welfare fund claim.

The cases LGA cites do not support its position that vacatur is required. LGA's motion for reconsideration is DENIED.

## II. Aguaytia's Motion for Entry of Judgment

■ Aguaytia essentially asks this court to reconsider its earlier conclusion that remand to the ICC to decide the effect of the parties' Stipulation is necessary. Aguaytia asks this court to confirm the arbitration award and enter judgment that would either explicitly recognize the Stipulation as an offset to the award or to enter judgment in the full amount of the award, implicitly recognizing that the Stipulation would prevent Aguaytia from attempting to collect the stipulated amount. Aguaytia has moved for entry of final judgment, either in the full amount of $13,197,284.00, plus interest, or in the net amount of $7,821,539.00, plus interest, after incorporating the stipulated credits as a setoff to the panel's award. (Docket Entry Nos. 62, 71).

This court previously considered, and rejected, Aguaytia's argument that this court has the authority to modify the award by reducing it to reflect the stipulated amount of $5.2 million in credits due LGA. Since then, the parties have presented additional information clarifying the relationship of the parties' Stipulation to the Final Award. This additional information, which is undisputed, clarifies what items are affected by the stipulated amounts and the dates of payment to be used to calculate pre-award and post-award interest. LGA has not disputed any aspect of the supplemented record that presents the final account balance resulting from offsetting the panel's final award by the parties' Stipulation.

Both parties oppose this court's previous order of a limited remand to the ICC, submitting to further arbitration the narrow issue of the effect of the parties' Stipulated Amounts on the Tribunal Awards. LGA asserts that remand would be "fruitless" because the arbitrators and the ICC "are neither prepared nor required to consider this Court's remand." (Docket Entry No. 60, p. 18). LGA notes that when the ICC approved the arbitrator's award, it sent a letter to the parties stating that "we are now closing the file for this matter" and "any documents submitted by the parties may be destroyed." (Docket Entry No. 60, Ex. 14). This court has no

reason to believe that the ICC would fail to comply with a court order remanding a discrete issue for further consideration. However, further arbitration and the delay that would result are inconsistent with the reason the parties agreed to arbitration in the first place. *See DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir.1997) (goals of arbitration are "settling disputes efficiently and avoiding long and expensive litigation"); *Legion Ins. Co. v. Ins. General Agency, Inc.*, 822 F.2d 541, 543 n. 3 (5th Cir.1987)(acknowledging that purpose of arbitration is to resolve disputes more quickly and efficiently and with less cost). Aguaytia's argument that further arbitration should be avoided if possible under the parties' contract, the record, and the applicable law, is persuasive.

Aguaytia urges this court to correct or modify the award to incorporate the Stipulation, under 9 U.S.C. § 11.[1] Section 11 of the FAA provides:

> In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—
>
> (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

1. Entering final judgment as to the full amount of the award in favor of Aguaytia, despite the panel's failure to include the stipulated credits, is not a palatable alternative. Aguaytia asserts that entry of final judgment in the full amount "would not harm LGA in any respect." (*Id.*). In response to LGA's concern that it would permit Aguaytia "double recovery," Aguaytia points out that it is bound by its stipulation to the panel and its repeated judicial admission that it owes LGA $5.2 million in credits. Aguaytia urges entry of judgment in part because it is currently earning pre-award interest at an annual rate of 4.75 percent; the post-judgment interest

rate is nine percent. Aguaytia asserts that "[t]his difference in both the interest rate and the amount to which it is applied is material and would be irretrievably lost if the award is not entered." (Docket Entry No. 71, p. 3). "In essence, LGA would continue borrowing from Aguaytia at a highly favorable rate simply because of LGA's refusal to live up to the bargain it struck." (*Id.*). However, if judgment is entered on an amount that Aguaytia recognizes incorrectly includes the credits that LGA is due under the parties' Stipulation, the amount to which the post-judgment interest rate is applied is also incorrect.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

9 U.S.C. § 11.

Aguaytia argues that this court has the authority to modify the Final Award to include the Stipulation under 9 U.S.C. § 11(c), which permits modification of an award that is "imperfect in a matter of form not affecting the merits of the controversy," and under the general provision stating that "[t]he order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties." (Docket Entry No. 54, pp. 3–4). Although this court previously found that the requirements of section 11 were not met, the supplemented record leads to a different conclusion.

Crediting LGA for the amounts agreed in the Stipulation does not affect the merits of the controversy. Given the additional information the parties have provided, all that is required to incorporate the Stipulation into a modified award and final judgment is a mathematical calculation that is before this court and is not disputed. *See, e.g., Atlantic Aviation, Inc. v. EBM Group, Inc.*, 11 F.3d 1276 (5th Cir. 1994) (panel's failure to award balance remaining under contract was "clerical" error that district court could correct where it was undisputed that amount was owed); *Flender Corp. v. Techna–Quip Co.*, 953 F.2d 273, 280 (7th Cir.1992) (upholding

confirmation of arbitration award where arbitrators determined liability but left district court to do "ministerial computation of the amount owed" to the prevailing party); *Gerling Global Reins. Corp. v. Yasuda Fire & Marine Ins. Co., Ltd.*, 1999 WL 553767 (S.D.N.Y. July 12, 1999) (ordering parties to calculate total amount owed to prevailing party by applying formula arbitrators specified in award). Section 11(c) provides a basis for modification. The modification Aguaytia requests also promotes justice between the parties, who jointly requested the panel to include their Stipulation an offset to the Final Award.

Two cases helpfully illustrate how courts have addressed situations in which the form of the arbitration award presented similar problems. In *Hewlett–Packard Co., Inc. v. Berg*, 61 F.3d 101 (1st Cir. 1995), the plaintiffs, assignees in bankruptcy, filed a request for arbitration against a company that had unilaterally terminated a distributorship agreement with the debtor. The debtor and the defendant had entered into two distributorship agreements, one in 1982 and one in 1984. The plaintiff's termination claim was based on the 1984 agreement. The defendant asserted counterclaims based on the 1982 agreement. The arbitrators found in favor of the plaintiff on the claim under the 1984 agreement, but "[t]o both parties' surprise, the tribunal held that it was without jurisdiction to decide [the defendant's] more substantial claim based on the 1982 contract, ruling that the 1982 contract was not within the Terms of Reference issued by the arbitrators at the beginning of the proceeding." *Id.* at 103. The defendant filed a request with the arbitration panel for a second arbitration to determine its claims under the 1982 agreement. The defendant[2] then sued in the district court,

---

**2.** The defendant in the arbitration was the plaintiff in the lawsuit. However, to reduce confusion, this court refers to the defendant in the arbitration as the defendant throughout the case discussion.

requesting the court to declare that it was entitled to a setoff in the amount allegedly owed under the 1982 agreement. When the plaintiff moved to confirm the arbitration award in full, as Aguaytia does in this case, the defendant urged the court to include the amount due under the 1982 as a setoff or to stay the confirmation pending the results of the new arbitration. *Id.* at 103.

The district court confirmed the arbitration award on the 1984 agreement; denied the request for a setoff as "an improper attempt to modify the tribunal's award"; ordered the parties to arbitrate the claims on the 1982 agreement, and refused to stay the confirmation of the 1984 award pending the remaining arbitration. The court did not, however, enter final judgment on the confirmed award. On appeal, the First Circuit affirmed the district court's order confirming the part of the award on the 1984 agreement, but held that the court did have the authority to stay the confirmation of the award until the arbitration on the remaining part had been concluded. The court held that the district court properly denied the motion for a judicial setoff of the remaining part of the claim, stating that "the district court could not allow the set-off at present without determining that [the defendant] had a valid claim, which is the very subject of the arbitration." *Id.* at 105. The court explained that "the judicial set-off requested would circumvent the 1982 contract to arbitrate and the now-pending arbitration under that contract."

*Id.* However, the appellate court's explanation made it clear that if the right to the setoff had already been determined, the district court could have entered the setoff as part of the order confirming the award.

In the present case, as in *Hewlett–Packard*, the arbitration panel similarly refused to address a related matter. However, in the present case, unlike *Hewlett–Packard*, the related matter is not disputed. Given LGA's withdrawal of its claim of IGV taxes, there is no disputed issue left to be arbitrated. The setoff requested is based on the parties' Stipulation. The validity of the credits due LGA, the dates on which those credits are to be applied, and the amount of those credits, has already been determined by the parties' Stipulation. A court order confirming the arbitration award and incorporating the Stipulation as a setoff does not offend the arbitration statute or the parties' arbitration agreement. Neither the Federal Arbitration Act nor the parties' arbitration agreement requires the parties to submit undisputed aspects of their relationship to arbitration. *See* 9 U.S.C. § 2 (providing that agreements "to settle by arbitration *a controversy* thereafter arising out of such contract or transaction" are enforceable under the FAA) (emphasis added). Under the approach that the First Circuit recognized in *Hewlett–Packard*, confirming the tribunal's Final Award as the resolution of the parties' disputed issues and recognizing the parties' Stipulation by a setoff to the amount awarded is consistent with the parties' arbitration contract and the Federal Arbitration Act.[3]

---

3. *Hewlett–Packard* provides another illustration of the problem with Aguaytia's motion for entry of judgment in the full amount of the tribunal's award, without an offset for the parties' Stipulation. In *Hewlett–Packard*, the court stated that the defendant had "made a reasonable effort to have both the [plaintiff's] claim and its own counterclaim resolved in one proceeding at the same time. Only the arbitrator's surprising interpretation of their mandate frustrated this attempt." The court

stated that under these circumstances, "the seemingly fair solution would be to confirm the award in its uncontested part, reserving confirmation of the balance" until the remaining dispute was resolved, which, in that case, required further arbitration. *Id.* The court noted that "[w]e think it would require some explanation if, in the face of the equities of this case, the district court concluded that the full award should be confirmed and collected now." *Id.* at 106. The equities of the

In *Atlantic Aviation, Inc. v. EBM Group, Inc.,* 11 F.3d 1276 (5th Cir.1994), the Fifth Circuit considered a similar problem. The arbitration panel in that case had issued an award that did not include any offset to delay damages awarded under the parties' contract for amounts still owed under that contract. The plaintiff moved the panel to modify its award to reflect the balance due. When the defendant opposed further actions by the panel, the plaintiff filed suit in state court to modify, correct, and confirm the arbitration award. The defendant removed based on diversity jurisdiction and counterclaimed to vacate the award on other grounds. The district court declined to set aside the award, but found it unenforceable for lack of finality. The court declined to correct or modify the award on the ground that it could not do so without affecting the merits of the case, and remanded it for arbitration before a new panel. The Fifth Circuit reversed the district court's conclusion that the award had to be vacated, finding that the panel had addressed all the disputed issues before it and noting that "an omission to address all issues does not necessarily justify setting an award aside if the decision of the arbitration panel rests on an adequate basis." *Id.* at 1280 (citing *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Texas,* 915 F.2d 1017, 1023 (5th Cir.1990)).

The Fifth Circuit held that the district court had the authority to correct or modify the arbitration award under section 11 of the FAA. The court stated as follows:

the failure of the panel to award the balance remaining under the contract ... was in essence a clerical error which may be corrected without disturbing the merits of the arbitrators' decision. Neither party disputed that the money was

owed, and the testimony of a majority of the arbitrators reveals that it was the panel's intention to offset the amount owed to [the prevailing party] by the amount [it] still owed to [the other party to the arbitration]. Correcting the award to reflect this intention neither changes the panel's findings [on the merits] nor affects the panel's award [to the prevailing party.]

11 F.3d at 1283. The Fifth Circuit reversed the district court's ruling that it could not modify or correct the arbitration award without affecting the merits of the dispute. The court remanded for modification of the award to offset the amount owed to the prevailing party in the arbitration by the amount the prevailing party still owed under the contract. *Id.*

In the present case, as in *Atlantic Aviation,* neither party disputes that the amount the arbitration panel declined to award was in fact due, and neither party disputes the amount. Both parties agree that Aguaytia owes LGA the Stipulated Amounts. In the present case, it appears at first glance that unlike *Atlantic Aviation,* the panel did not state an intent to offset the amount owed to the prevailing party by the amount it owed under the contract. However, the panel did make clear that it believed it was addressing and resolving every issue that was disputed between LGA and Aguaytia at the end of the Phase II hearing. The panel clearly stated its understanding that the parties had resolved certain issues by agreement and removed those issues from the arbitration process. The panel in the present case stated its intent to issue a Final Award that resolved all the disputed issues. The panel in the present case stated its recognition that the only further step

present case similarly counsel against a judgment for the full arbitration award, without

including the stipulated amounts.

required was "a complete definition of the final amount of funds payable from one party to the other...." (Docket Entry No. 36, Ex. B, p. 3 n. 2). The panel understood that there was no dispute between the parties as to that further and final step. Just as the panel in *Atlantic Aviation* intended to offset the amount owed to the prevailing party by the amount it owed the other party, the panel in the present case conveyed its recognition that the parties' Stipulation as to the credits due LGA would be applied to offset the amount awarded Aguaytia in the arbitration to derive the final amount of funds payable from one party to the other.

Because there is no dispute as to the "complete definition of the final amount of funds payable from one party to the other," there is no need for another arbitration proceeding. Because the panel's award may be given the intended effect by the clerical work necessary to incorporate the parties' Stipulation into the Final Award, which does not disturb the merits of the arbitrators' decision, section 11 permits this court to do so by correcting or modifying the award. *Atlantic Aviation,* 11 F.3d at 1283.

This court modifies the arbitration award by incorporating the parties' Stipulation, entering judgment in the amount of $9,253,891.00, consisting of $7,821,539.00 in principal and $1,432,352.00 in pre-award and post-award interest, in favor of Aguaytia.[4] This court GRANTS Aguaytia's motion to enter final judgment in the amount of $9,253,891.00, as of June 10, 2002.

### III. Conclusion and Order

Based on the pleadings, the motions and responses, and the applicable law, this court DENIES LGA's motion to reconsider and GRANTS, in part, Aguaytia's mo-

tion for entry of final judgment in the amount of $9,253,891.00, consisting of $7,821,539.00 in principal and $1,432,352.00 in pre-award and post-award interest, as of June 10, 2002. Aguaytia is directed to submit a proposed form of final judgment by June 21, 2002.

---

4. Aguaytia calculated the interest owed as $1,390,614.00, as of May 1, 2002, plus $1,018 per day until judgment is entered. This court has applied the $1,018 figure to arrive at a total pre-award and post-award interest amount of $1,432,352.00, as of June 10, 2002.